**STERLING–KATES**

v.

**The UNITED STATES.**

No. 602–81C.

United States Claims Court.

April 29, 1987.

See also 5 Cl.Ct. 398.

John H. Tracy, Washington, D.C., Gadsby & Hannah, of counsel, for plaintiff.

Richard Silber, with whom was Thomas W. Petersen, David M. Cohen, and Asst. Atty. Gen. Richard K. Willard, of the Dept. of Justice, Jane Sanders, General Services Admin., of counsel, for defendant.

## OPINION

YANNELLO, Judge.

This case involves a "Solicitation for offers" by the government, through the General Services Administration (GSA), for the construction of an office building in Prov-

idence, Rhode Island to then be leased to the government. The "Solicitation" provided that the successful "offeror" would be assigned the government's option to purchase the land on which the building was to be constructed; the successful "offeror" would then exercise the option to acquire title to the site and construct and lease an office building to the government.

Plaintiff submitted an "offer" in response to this solicitation, and negotiations ensued. On September 18, 1980, plaintiff was notified that its proposal had been accepted by the government. Plaintiff, however, failed to execute the contract documents. The question in this case is whether a valid contract had come into being.

Believing a valid contract to have been awarded, the government's contracting officer issued a final decision on October 9, 1980, terminating the contractor for default. The contractor then filed this suit, on October 7, 1981, pursuant to the Contract Disputes Act, 41 U.S.C. § 609.

On April 21, 1982, the government's contracting officer also issued a final decision, based on the earlier default termination, assessing plaintiff the costs of reprocurement (as stated in defendant's Amended Answer and Counterclaim filed January 12, 1983). Plaintiff addressed this counterclaim (and, in effect, appealed this decision) in its Answer to Defendant's First Amended Answer and Counterclaim filed February 4, 1983, within 12 months of the issuance of the decision.

## Jurisdiction

The plaintiff's initial petition sought award of costs based on an alleged breach by the government of its implied contract to fairly and honestly prepare the solicitation and consider plaintiff's proposal—specifically in that the government allegedly misrepresented certain information. (While the costs sought are those incurred in bid preparation—since no contract work was performed—this is not a "bid protest"

suit. *See* Petition, paras. 30 and 31.) This allegation is addressed in the opinion (and Findings) below.

There is no dispute concerning the court's jurisdiction of this count except as discussed below.

The plaintiff also initially alleged that no contract had come into being and thus requested the court to reverse the 1980 decision of the Contracting Officer and find that plaintiff did not default the contract. See Petition, paras. 25 and 26. (This allegation need not be addressed separately inasmuch as subsequent pleadings merge this allegation with a defense to defendant's counterclaim.) *See* discussion below; *see also Nuclear Research Corporation v. United States,* 814 F.2d 647 (Fed.Cir., 1987).

Plaintiff reiterated these allegations, in its Answer to defendant's First Amended Answer, wherein plaintiff contested the government's claim for excess reprocurement costs by alleging that the default termination was improper and that no contract had been entered into. These issues were the subject of trial and briefing and are addressed in the opinion (and Findings) below.[1]

There is no dispute concerning this court's jurisdiction over the government's counterclaim.

The sole jurisdictional issue raised by the parties concerns the proper statutory conferral of jurisdiction.

■ The government does not dispute this court's jurisdiction under the Tucker Act, 28 U.S.C. § 1491. However, defendant does maintain that the lease agreement does not fall within the purview of the Contract Disputes Act because it deals with real property. It has been decided that the acquisition of a lease agreement, such as the one in issue here, is within the scope of the Contract Disputes Act. *Forman v. United States,* 767 F.2d 875 (Fed.Cir.1985)

The relevant specific Findings of Fact are set forth below.

1. In view of the ultimate resolution of these issues, there is no need for further proceedings concerning the counterclaim (such as the sever-

al affirmative defenses alleged by plaintiff, including untimely reprocurement and reprocurement differing from the original solicitation).

## FINDINGS OF FACT

### A. The Options

1. The government held two assignable options to purchase land located in Providence, Rhode Island.

The land was owned by B.A. Dario Company and Ron Jean Realty Company, both Rhode Island corporations. (Hereinafter the options and landowners are referred to in the singular.)

It was the government's intention that these options would be assigned to, and exercised by, the private contractor who successfully responded to a Solicitation for procurement (more fully discussed below). The contractor would acquire title to the land by exercising the option and construct an office building on the site which would then be leased to the government.

The options were not publicly recorded.

2. The options contained provisions addressing the following items:

(a)(1) a grant of the option from the landowner(s) to the government; and

(2) the terms and conditions of the exercise of the option, including duration and price (and adjustments therein), and the manner of payment; and

(3) provisions for the transfer of title, including provisions relating to liens, taxes, loss of property prior to transfer, and access to property prior to transfer (for surveys and the like).

(b) Description of the land (as contained in attached schedules)

The purchase price for the land covered by the option(s) was slightly less than $500,-000.00 (i.e., $497,750.70) subject to various adjustments (such as those dependant upon the time the option was exercised).

3. a. The option also provided that: In the event any Relocation Assistance should be required under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, Public Law 91–646, all costs related thereto shall be borne by the Government or the developer (assignee).

(By implication, such costs were not to be borne by the landowner or optionor.)

b. The option did not contain any discussion or description of tenants or occupants of the site. There was no mention of any lease or terms of tenancy.

4. a. Further, the option recognized that its purpose was the construction of buildings to be occupied by the government. The option provided that demolition of all or a part of the existing structure should be coordinated between the developer (i.e., the government's assignee) and the landowners. Structures currently existed on the property which spanned the property line to adjacent property of the landowners.

b. The option stated that "if the property owner (Dario and/or Ron Jean) is not the selected developer, this option to purchase shall conform to all deposit and payment procedures, as herein specified."

c. The option also provided that, with respect to the property owned by Ron Jean Realty Company, the purchase price might be adjusted, at the rate of $17.33 per square foot,

after review of surveys and the city assessor's maps and appropriate legal documents to prove ownership of a five foot strip of land shown on the city assessor's plan as a part of a 12 foot gangway.

### B. The Solicitation

5. a. In 1980, the General Services Administration (GSA) issued a "Solicitation for Offers" (No. 1 PRS 1586, hereinafter "the Solicitation") for the construction and lease of an office building in Providence, Rhode Island.

The Solicitation stated that it was issued pursuant to Section 302(c)(10) of the Federal Property and Administrative Services Act of 1949 as amended, and that the GSA contracting officer (CO) "shall have the exclusive authority to negotiate any and all provisions of this transaction." [2]

---

**2.** The statutory citation in the text is now contained in 10 U.S.C. § 2304(a). (The amendments to that provision occasioned by the enactment, in 1984, of the Competition in Contracting Act, 41 U.S.C. 251 et seq., do not apply here.)

The solicitation provided that there would be no public opening of bids.[3]

6. a. The Solicitation directed that offers would be received until March 20, 1980.

b. The Solicitation also provided that all offers were to be kept confidential until the award of a contract. The offeror was prohibited from entering into negotiations concerning the space to be leased with any federal agencies other than GSA.

c. The Solicitation (and the lease agreements prepared by the parties) stated that the contract was subject to the Contract Disputes Act of 1978, 41 U.S.C. § 601 et seq. (See also discussion above.)

7. The solicitation provided that the building lease was to be for a term of 20 years, with defendant possessing two options, each to extend the term for an additional 5 years.

The Solicitation, in Schedule A, Part I, paragraph 5, "Evaluation of Offers", provided that:

> In evaluating offers received in response to this solicitation, only the rental rate offered for the initial lease will be considered.

The paragraph provided for negotiations to obtain the most reasonable rental offer possible for both the initial term and the renewal period. Contract price was to be subject to negotiation.

8. The Solicitation contained, in Schedule D, paragraph 13, a general provision listing the factors to be considered in an award, in addition to the proposed rental and space requirements. Included in this listing were design factors (including accessibility to the handicapped); environmental factors, factors relating to the environs of the site, and, in subparagraph (e), date of delivery.

9. a. With respect to the options described above, the Solicitation provided that:

> the government holds assignable options on two parcels of land...... The successful offeror will acquire the options from the Government and shall then proceed to acquire title to the site in accordance with these options.

b. The Solicitation further required that:

> The successful offeror shall be requested to search the title to the site, survey the area, and assume all costs normally assumed by a purchaser or [sic] real estate in Rhode Island.

and also stated that:

> While the Government believes that full and vested title is vested in the purported owner of the site, the Government makes no guarantee to that effect, and will under no circumstances be liable for the correctness of survey data or the validity of title.

c. The options themselves were not contained in or furnished with the Solicitation, nor were they officially recorded.

10. a. The Solicitation provided that the "[p]remises are required for Government occupancy 700 days after lease award" and that "[o]ccupancy by the Government is desired within 700 days after award".

b. The Solicitation also contained a sample of the lease agreement to be executed upon contract award. That agreement, in paragraph 2, set forth the period of lease and occupancy by the Government as follows:

> To have and to hold the said premises with their appurtenances for the term beginning on _____ through _____ subject to

---

This provision permits procurement through negotiation where "the purchase or contract is for property or services for which it is impracticable to obtain competition". This is an exception to the general requirement that federal procurement be conducted through advertised solicitations for competitive bids. This procurement involved a negotiated, rather than an advertised or competitive, contract.

**3.** The provisions of 10 U.S.C. § 2305(c) state that, where advertisement of contract solicitations is required, bids shall be opened publicly at a time and place stated in the advertisement.

However, as stated in footnote 1 above, the solicitation in issue here was for a negotiated, rather than an advertised, contract.

termination and renewal rights as may be hereinafter set forth.

11. a. The Solicitation also advised prospective offerors that:

[t]he lease agreement shall not be terminated nor the lessor charged with resulting damage if: the delay in the completion of the work and delivery of the premises ready for occupancy by the Government, arise from unforeseeable causes beyond the control and without the fault or negligence of the lessor and/or his construction contractor, including but not restricted to acts of God, ... acts of the Government in either its sovereign or contractual capacity. . . .

The contract also contained standard provisions concerning Changes and time extensions.

b. A utility plan and boundary plan of land in Providence for the site of the proposed federal office building were attached to the Solicitation.

c. Existing one-story concrete block buildings are clearly marked on the utility plan.

d. The Solicitation also set forth the purchase price in the option, and further stated that:

However, it should be noted that the land area shown on the attached plan (designated lot 406) may be adjusted after review of surveys, city assessor's map, and appropriate legal documents to prove ownership of an additional five foot strip of land, shown on the attached plan, as part of the 12 foot gangway.

12. a. The Instructions to Offerors, which accompanied the Solicitation, stated that the successful offeror will be required to execute a United States Government lease for real property as prescribed in the Code of Federal Regulations.

b. The Instructions stated that "[a]ny explanation or additional information desired regarding the meaning or interpretation of conditions or specifications must be requested from the issuing officer in writing and with sufficient time allowed for reply before submission date of offer. Oral explanations or instructions are not binding."

c. The Instructions informed prospective offerors that "[o]ffers may be withdrawn on written request received from the offerors at the address shown on the solicitation prior to the closing time for receipt of offer." The Instructions also warned that "[n]egligence on the part of the offeror(s) in preparing the offer confers no right of withdrawal after the time fixed for the opening of offers."

d. The Instructions informed prospective offerors that "[t]he unconditional acceptance of an offer received in response to the solicitation establishes a valid contract extending to all covenants of the solicitation, offer, and acceptance, between the offeror and the Government."

e. The Solicitation also required that, "after submission of offers and prior to award of a lease contract and upon the request of [GSA], offerors shall submit to the Contracting Officer: (a) satisfactory evidence of at least a conditional commitment of funds in an amount necessary to perform the work, and (b) the name and address of the construction contractor who will construct the building and facility." (The Solicitation also provided that the successful offeror shall submit evidence of a firm commitment of funds within 60 days after award.)

### C. The Proposal

13. a. On or about February 19, 1980, plaintiff (a joint venture composed of Sterling Engineering and Construction Co., Inc. and Kates Properties, hereinafter referred to as "Sterling-Kates") received by certified mail, a copy of the Solicitation and of the Instructions to Offerors pertaining thereto.

b. Sterling Engineering described itself as a "full service construction company with the staff, financial strength and equipment to provide a full range of building services." Kates Properties described itself as a "nationally recognized full-service real estate company with experience in all phases of development."

c. Plaintiff, Sterling-Kates, submitted a proposal in response to the government's Solicitation on March 20, 1980, and ultimately became the "successful offeror". Additional findings concerning plaintiff's proposal and later events are set forth below.

d. In submitting its proposal, Sterling-Kates executed a form stating that:

the offeror agrees upon acceptance of this proposal by the date specified, to lease ... the premises as described and upon the terms specified, in compliance with ... [the solicitation]

14. a. From the time they received the Solicitation, it was apparent to Sterling-Kates, that they would have to demolish the buildings that existed on the subject site.

b. Prior to March 20, 1980, an officer of plaintiff, Mr. Pearlman[4], visited the proposed site and observed a series of connected buildings that extended onto both the property to be developed by the "successful offeror", as well as onto the adjacent property that was not to be developed.

c. Prior to March 20, it was not clear to Mr. Pearlman, based on his personal observations of the site and his review of the boundary plans attached to the Solicitation, exactly where the property line ran in relation to the existing building on the proposed site.

d. Mr. Pearlman advised Mr. Shulman, a leasing officer of GSA who conducted most of the contract negotiations here in issue[5], that he saw problems regarding the existing buildings and their demolition, which were not fully described in the Solicitation. For that reason Mr. Pearlman requested additional information including

the options held by the government which were not furnished with the Solicitation.

e. Sterling-Kates inferred that the options would have no effect on the parties submitting proposals because they were not attached to the Solicitation.

f. Another of plaintiff's employees, Mr. Polton[6], also visually surveyed the site prior to March 20, 1980.

g. Sterling-Kates relied on the boundary plans provided in the Solicitation and did not conduct any other surveys to confirm that the boundary plans were correct and accurate. (*See also* Finding 9 (b) above.)

h. The demolition of the building later became one of Sterling-Kates' greatest concerns.

i. Four representatives of Sterling-Kates, including Messrs. Pearlman and Polton, also were aware, prior to March 20, 1980, that tenants were located in the building which was to be demolished.

15. a. Mr. Pearlman, of Sterling-Kates, testified based on personal recollection and memory. There was no documentary evidence introduced at trial, such as notes or other corroboration, referencing requests to GSA.[7]

b. Shortly before March 20, 1980, Mr. Pearlman orally requested that GSA provide Sterling-Kates with copies of the options that were described in the Solicitation.

c. Mr. Pearlman's first request for copies of the options was directed to Mr. Shulman, a leasing officer for GSA.

---

4. Mr. Mark Pearlman, vice president and treasurer of Sterling Engineering, is a registered professional engineer in Rhode Island and is also an attorney, admitted to practice in both Massachusetts and Rhode Island.

5. Mr. Shulman was not the contracting officer. The official contracting officer here was Kevin Kelly, who was not a major participant in contract negotiations.

6. Mr. Polton, director of development for Sterling Engineering, was primarily responsible for the energy requirements. Mr. Polton holds two

undergraduate degrees from Columbia University and the Rhode Island School of Design. In addition, he holds two masters degrees from Massachusetts Institute of Technology in City Planning and Architecture.

7. Defendant objects to many, if not most, of plaintiff's proposed findings on the grounds that there is no documentary evidence in support thereof. There is, however, testimony evidence which, if credible, is sufficient basis for the court's findings.

d. Mr. Shulman refused to provide copies of the option and told Mr. Pearlman that the options were "standard".[8]

c. After Mr. Shulman refused to give Mr. Pearlman the options, Mr. Pearlman did not request to speak to the contracting officer, Mr. Kevin Kelly.

16. a. No legal representative or officer of Sterling-Kates made any written request for copies of the options from GSA, prior to March 20, 1980.

b. Letters written by Sterling-Kates between March 20 and September 18, 1980, never mentioned requests for copies of the options.

17. Prior to Sterling-Kates' March 20 proposal, Mr. Pearlman also requested copies of the option from Oscar Paquin of the office of one of the landowners, Mr. Dario. The request was not granted.

18. a. Mr. Polton, another officer of of Sterling-Kates, did not make any requests for copies of the option prior to March 20, 1980.

b. Mr. Polton could not testify that he has seen a standard option; only that he is sure there is such a thing as a "standard" option.

c. Mr. Polton defined what he expected a "standard" option to be: an option where all terms and conditions are clearly delineated and there is no open issue or issue where there is potential for dispute.

d. Mr. Carlotti, a member of the Rhode Island bar and one of the attorneys who represented Sterling-Kates in the contract negotiations, testified that:

> The normal practice in Rhode Island is for an option to consist of four parts; part one is the option itself [including terms and conditions] ....... Part two is a legal description.... Part three normally is a purchase and sales agreement.... And finally, of course, is a memorandum of option which recites that the option exists ........

Mr. Carlotti also testified that the option is then notarized and is customarily recorded in the land records where the property is located.

19. Sterling-Kates inferred that a "standard" option would not give Sterling-Kates any problems nor affect the proposal it submitted.

20. Prior to submitting its proposal of March 20, 1980, Sterling-Kates was aware that there were commercial tenants occupying the existing building on the proposed site and was aware of the significant impact the process of eviction of the tenants would have on the developer (plaintiff) and on the schedule for contract completion.

21. Mr. Carlotti, attorney for plaintiff, was aware of the risks of being bound in a contractual relationship and having an option that is not standard as part of the contract. He stated that this was what prompted him to write a letter on or about September 25, 1980 (discussed in detail below).

22. Prior to March 20, 1980, Sterling-Kates did not write any letters to GSA concerning the tenant problem or any sewer easements. (The sewers serving the existing building both on the parcel of land to be developed under the option and extending to adjacent property.)

23. a. On March 20, 1980, plaintiff Sterling-Kates submitted a proposal in response to the government's Solicitation. The offer proposed completion by December 31, 1981 and a lease date beginning January 1, 1982.

b. The "offer" was open for "acceptance" by the government until August 1, 1980.[9]

c. Sterling-Kates intended to be bound by this "offer".

24. a. On June 13, 1980, a meeting was held between officials of GSA and officials from Sterling-Kates.

<hr/>

**8.** Based on the scant evidence in the record, it appears that the government's reluctance to provide copies of the options was grounded on the landowners desire to withhold the information contained therein until a successful offeror was identified and selected by the government.

**9.** The terms "offer" and "acceptance" are used in the Findings of Fact as they appear in the Solicitation Materials. The import of this terminology, as a matter of law, on the questions presented in this case is discussed in the Opinion below.

This meeting essentially marked the beginning of formal negotiations.

Sterling-Kates agrees there were no misrepresentations by the government during negotiations.

b. In attendance were: Messrs. Pearlman and Polton of Sterling-Kates; Mr. Nickerson, attorney for S–K; and Messrs. Shulman and Quinlan of GSA.

c. At the meeting, Mr. Pearlman requested a copy of the options from GSA.

d. Mr. Polton testified that the first request for a copy of the option he can vividly recall was at the June 1980 meeting at GSA. (*See also* Finding 18 (a) above.)

e. Between July and August, Mr. Polton recalls requesting the options weekly or biweekly.

25. a. By letter dated June 13, 1980, GSA requested that Sterling-Kates revise its March 20, 1980, offer and formally submit its best and final offer by June 20, 1980. In that request GSA wanted a revised Yearly Energy Consumption Certificate with the resubmittal.

b. Accordingly, Sterling-Kates submitted its revised proposal on June 20, 1980, even though it still did not have the copy of the option it requested at the June 13, 1980, meeting.

c. The June 20 "offer" was open for "acceptance" by the government until October 1, 1980. No reference was made to the options in the revised offer. The offer contemplated completion by March 31, [1982], and a lease date beginning April 1, 1982.[10]

d. Sterling-Kates intended to be bound by the June 20 offer.

26. a. GSA informed Sterling-Kates by letter dated June 25, 1980, that its energy consumption certificate exceeded the government specified energy conservation goals. GSA requested that the proposal be clarified by the close of business of June 30, 1980.

b. Sterling-Kates provided GSA with its revised energy calculations and backup documentation in a letter dated June 30, 1980. (This clarification did not otherwise modify or alter any of the terms of the June 20, 1980, proposal discussed above.)

c. Sterling-Kates intended to be bound by the representation contained in the attachments to the letter.

27. On or about July 8, 1980, Mr. Polton spoke with Mr. Shulman by telephone. Mr. Shulman indicated that Sterling-Kates would be the likely successful offeror. In light of this information, plaintiff began seriously working to "pin down the elements of the proposal that were unresolved."

28. By letter dated August 6, 1980, Sterling-Kates provided GSA with a conditional commitment of financing from the Erie Savings Bank. (This conditional commitment was later withdrawn in early or mid-September 1980.)

### D. The Negotiations

29. a. By letter dated September 3, 1980 and received on September 8, 1980, the contracting officer, Kevin Kelly, forwarded to Sterling-Kates (through Mr. Nickerson) the lease document for plaintiff's review and execution. This was received on September 8th.

Copies of the options for purchase of the land were furnished to plaintiff for the first time as attachments to the letter of September 3, 1980. (These copies, although marked "sample", are identical to the actual options introduced into the record before this court.)

The forwarding cover letter stated that:
... lessor's execution of these documents in no way implies or creates a valid contract between the parties until such time as the Government duly executes the agreement.

and further alerted plaintiff that:
Further, the Government's presentation of these documents .. in no way infers

---

**10.** The proposed document actually stated a construction completion date of March 31, 1981, less than 1 year from the date of the proposal; this, given the proposed occupancy date, was apparently a typographic error.

The proposal also stated that the initial 20 year lease would end in the year 2001, apparently an error which should have read 2002. (See also Finding 29(b).)

that a lease award has been made by the Government.

b. In paragraph 2, the tendered lease document stated that the duration of the lease was from August 1, 1982, through July 31, 2002. (See also Finding 25(c), fn 9, above.)

The period from and including September 3, 1980, to and including August 1, 1982, consists of 698 days.[11]

c. The lease did not address the situation of current tenants on the site nor relocation expenses for them.

d. The letter from GSA dated September 3, 1980, requested Sterling-Kates to execute both copies of the lease agreement and return them to GSA.

e. Plaintiff did not execute the lease as tendered to them on September 3, 1980.

30. a. After receiving and reviewing the options in early September 1980, Sterling-Kates had both of their attorneys review the options.

b. Mr. Carlotti reviewed the options but did not speak with the contracting officer.

c. Mr. Carlotti spoke with Mr. Manley, attorney for GSA in Boston, concerning his dissatisfaction with the format, terms and conditions of the sample option for the purchase of the building site.

31. a. By September 9, 1980, Mr. Pearlman's review revealed that there were issues of concern to Sterling-Kates that were not specifically addressed in the options.

b. The issues of concern involved existing tenants, demolition of the building, subsurface utilities (including sewers), and the gangway.

32. Upon receiving the options as furnished to them by letter dated September 3, 1980, Sterling-Kates elected to keep their offer outstanding and to proceed to negotiate for additional terms in the options, rather than inform the government that they were surprised or misled or that they wanted to withdraw their offer.

Sterling-Kates never notified GSA that they were withdrawing their proposal.

Mr. Pearlman testified that they did not withdraw their proposal at any time, either in writing or orally.

33. On September 12, 1980, Mr. Pearlman called Mr. Shulman to discuss problems with the option and particularly how the presence of tenants might delay construction.

34. a. A meeting was held on September 18, 1980, between representatives of Sterling-Kates (Messrs. Pearlman, Polton, and Nickerson) and GSA (Messrs. Shulman, Laribee, and Quinlan). The contracting officer, Mr. Kelly, was not present at this meeting.

At the outset of the meeting, Mr. Shulman indicated that, while discussion of issues was anticipated, he did not expect any binding agreement to be reached or be entered into.

b. One thing that concerned Sterling-Kates was that the proposed lease language was different than that in the solicitation in that it required the building to be turned over to the government on August 1, 1982, as opposed to completing the building within 700 days after contract award.[12] (See also finding 10 above. A period of 700 days from and including the date of award, assuming that date to be September 3, 1980, would be approximately August 3, 1982.)

c. Plaintiff expressed the concern that the building might be completed in fewer than 700 days from award of the contract and that plaintiff might then be required to maintain an empty building until the stated date certain, in the lease, for government occupancy. The government, on the other hand, did not wish to be committed to an early occupancy while other existing lease obligations continued.

11. The figure set forth in the finding results from the court's judicial notice of and computation from a perpetual calendar for the years in question.

12. Mr. Pearlman testified from present recollection refreshed. He referred to notes he took at the meeting.

d. The plaintiff and the government tentatively agreed upon a solution which would permit the government to occupy the building upon its completion, but not earlier than March 1, 1982 and not later than the date of August 1, 1982. (See also Findings 35(c) and 36(c)(1) below.)

e. Another matter discussed was the possible delays that might result from tenants still on the premises. It appears that no agreement was reached with respect to plaintiff's concerns about existing tenants at that time.

f. At another part of the meeting, Messrs. Nickerson and Shulman reached agreement concerning various minor matters (such as rodent control).

35. a. On September 18, 1980, the contracting officer transmitted a letter [13] to plaintiff stating that:

Please be advised that your offer in response to Solicitation No. 1PRA 1586, as amended, is hereby accepted by the Government.

This had not been discussed during the meeting of the 18th. (Plaintiff first learned of the award through the news media the evening of the 18th and subsequently received the government's letter.)

b. The letter of September 18, 1980, stated that:

The terms and conditions of the award are contained in the lease document forwarded to you on September 3, 1980.

There was one exception. (See (c) below.)

c. The letter of September 18, 1980, indicated only one change in the terms of the lease forwarded on September 3, 1980. Specifically, paragraph 2 concerning the date of occupancy was modified as follows:

Occupancy will occur no earlier than March 1, 1982 and no later than August 1, 1982, provided subject building is completed to the satisfaction of the United States Government under the specifications of this lease. * * *

The period from and including September 18, 1980, to and including August 1, 1982, as stated in the September 18, 1980 letter) is approximately 683 days. (See also Finding 29(b), and footnote 11, above.)

d. The letter also noted that:

It is imperative that this document be signed and returned to this office immediately.

36. a. Entered into evidence as Joint Exhibit 9, is an unexecuted lease agreement bearing the date of September 18, 1980.[14] This document was described as the "Final Lease Agreement".

b. The terms and conditions of the "final lease agreement" dated September 18, 1980, are markedly different from the terms of the lease forwarded by letter of September 3, 1980, and referred to, and incorporated as modified regarding occupancy date, in the government's letter of September 18, 1980, as noted below.

c. (1) This "final lease agreement" provided that occupancy would begin on August 18, 1982 (the letter of September 18, 1980, set that the occupancy date as August 1, 1982). The document, however, also contained in Rider No. 3, a provision, as suggested in the September 18th letter, that:

Occupancy will occur no earlier than March 1, 1982 and no later than August 18, 1982, provided subject building is completed....

(The period from and including September 18, 1980, to and including August 18, 1982, is 700 days. See also Finding 29(b), footnote 11, above.)

(2) The lease dated September 18, 1980, contains Addendum No. 1, in which the government agreed to pay the relocation expenses of on-site tenants who were caused to relocate due to the lease-construction project. (*See also* Finding 3 (a) above.)

The addendum also modifies provisions relating to the lessor's maintenance obli-

---

**13.** The letter dated September 18, 1980, is contained in Joint Exhibit No. 10.

**14.** Mr. Pearlman of Sterling-Kates testified that plaintiff received this document shortly after September 18, 1980 (Tr. 41). There may, however, be some confusion concerning the date of the preparation and forwarding of this document. See Finding 37 below.

gations and includes consent by the government to enter into a Subordination, Nondisturbance, and Attornment Agreement.

(3) The lease dated September 18, 1980, also contains Rider No. 4, which provides that, at any time during the lease, the lessor may provide space in the building to a tenant other than the government. The rider provides that in such a case, the lessor becomes responsible for providing common area services as described.

d. By letter dated September 24, 1980, GSA informed plaintiff that either it execute the lease by October 3, 1980, or be in default of contract.

37. a. By letter dated September 25, 1980, Mr. Carlotti informed defendant of certain additional terms that would need to be agreed upon before plaintiff would sign the lease agreement.

b. Essentially, the matters addressed in this letter were as follows:

(1) provisions concerning sewer demolition and easements involving adjacent landowners;

(2) provision providing for relocation expenses of tenants; [15]

(3) modification of the occupancy date to correspond to 700 days from date of award; [16]

(4) modification concerning maintenance obligations; [17]

(5) provision for subordination of an outstanding mortgage; [18]

(6) a memorandum of option between GSA and the landowners to be incorporated into the assignment to plaintiff; and

(7) an Indemnification agreement addressing possible difficulties in evicting present tenants, to include such alternatives as:

(A) plaintiff's withdrawal from the contract or renegotiation of rental price (if construction was delayed beyond November 30 by reason of either delay in removing tenants or delay in proceedings before the General Accounting Office (GAO) and/or

(B) compensation for out-of-pocket expenses if delayed by reason of a Rao appeal before the GAO. [19]

38. a. On September 26, 1980, a meeting was held between representatives of Sterling-Kate (Messrs. Pearlman, Nickerson) and GSA (Messrs. Shulman and Manley, a GSA attorney in Boston, and Bretta, a GSA Regional Administrator). [20]

At the meeting, the parties discussed the problems outstanding in the lease, particularly as raised in plaintiff's letter of September 25, 1980.

b. As stated in its September 25th letter, the plaintiff wanted the tenants to be vacated by a certain date. If tenants had not vacated by that date the government would indemnify plaintiff and permit Sterling-Kates the option of withdrawal from the lease agreement or return of any monies. The government said it could grant extensions of time but it could not indemni-

---

**15.** This concern is addressed in Addendum No. 1 of the unexecuted lease document dated September 18, 1980.

**16.** The latest occupancy date in the government's September 18, 1980, letter was August 1, 1982.

The unexecuted lease document dated September 18, 1980, addresses plaintiff's concern by providing an occupancy date of August 18, 1982, in paragraph 2 of the lease and in Rider No. 3.

**17.** This concern is also addressed in Addendum No. 1 of the lease document dated September 18, 1980.

**18.** This concern is also addressed in Addendum No. 1 of the lease document dated September 18, 1980.

The presence of terms, in the lease document dated September 18, 1980, addressing concerns raised in plaintiff's letter of September 25, 1980, suggests some confusion concerning the date of preparation and forwarding of the lease document. See also Footnote 14 above.

**19.** The GAO proceedings may have related to another bidder, although no explanation is furnished in the record before the court as to this reference.

**20.** There was some discrepancy as to whether or not Mr. Bretta attended this meeting. Mr. Pearlman's notes do not indicate that Mr. Bretta was there. However, on cross-examination, counsel for the defendant pointed out that paragraph 19 of the petition indicated that Mr. Bretta attended the September 26 meeting.

fy Sterling-Kates. The parties reached no conclusion on this issue.

c. They also discussed possible structural problems related to the demolition of the building (and the matter of sewer easements) and again the parties did not reach an agreement.

39. a. Following the meeting of September 25, 1980, a Lease Agreement was prepared which incorporates the agreements reached with respect to some of the matters discussed at the meeting.

b. The court finds that the lease document bearing the date of September 18, 1980, was not actually forwarded by or incorporated in the government's letter of that date, which letter makes no mention of any such document. While not specifically so described by the witnesses, the court also finds that Joint Exhibit 9, the unexecuted "final lease" document bearing the date of September 18, 1980, was in fact prepared and forwarded as a result of and following, the meeting of September 25, 1980. (See also Findings Nos. 36 and 37, and the footnotes therein.)[21]

40. These three areas, raised in plaintiff's September 25, 1980 letter, remained unaddressed by the final lease document bearing the date of September 18:

(a) agreement with adjacent landowners concerning demolition of sewers and easements;

(b) memorandum of option with landowners;

(c) issues of indemnification.

41. With respect to indemnification, the government stated clearly that it could not and would not enter into such an agreement; the contract's existing provisions (including standard Changes and Default clauses) were felt to adequately treat any matter of delay or additional expense. (Plaintiff's concerns related to delay which might be occasioned by tenant eviction or in GAO proceedings.)

42. The matters concerning sewer demolition and easements, and memoranda of options, concerned private landowners, as well as plaintiff and the government.

43. a. A meeting was held in Providence, Rhode Island, on October 1, 1980, in the Kates office, between GSA (Messrs. Kelly and Manley, with Kelly as the contracting officer appearing in such negotiations for the first time) and the plaintiff (Messrs. Polton, Pearlman, Sheehan, Carlotti, Nickerson) as well as a representative of the private landowners (Mr. Paquin).

b. The topic of discussion at that meeting was when the 700 day period would begin to run. The government said that the period would start from when the agreement was signed, not when the site was clear of tenants. Sterling-Kates would not sign the lease agreement until this matter was resolved.

c. At this meeting, the government again warned Sterling-Kates that it would be in default if it did not execute the lease agreement.

44. a. Another document was drafted, this by Mr. Carlotti of Sterling-Kates. It was entitled an "Assignment and Option Agreement" (hereinafter "Agreement") and treated the three outstanding matters raised in the September 25th letter. (*See* listing in Finding 40.)

b. The Agreement was to be signed by *four* parties: Sterling-Kates, GSA, and the two landowners, Dario and Ron Jean.

c. With respect to GSA, the Agreement merely provided that GSA thereby assigned the purchase options to Sterling-Kates. The remainder of the agreement treated the obligations of the optionor (the landowners) and the developer (S–K). Among the main items were agreements that *optioner* would remove any incumbent tenants by November 30, 1980, and agreements concerning demolition, adjacent property, and sewers. Optionor was to re-

---

**21.** Inasmuch as the confusion concerning the date of preparation and forwarding of this document was not specifically addressed in the evidence before the court, there can be no findings of fact as to why the document was pre-

pared on September 25, 1980, but dated September 18, 1980. (One might note, however, the coincidence of that date and the date of the government's letter announcing acceptance of plaintiff's proposal.)

ceive a payment upon execution of the Agreement.

45. a. On October 1, 1980, the Agreement was signed by Messrs. Pearlman and Kelly (S–K and GSA respectively) and these signatures were notarized by Mr. Carlotti. The document was held by Mr. Carlotti pending another scheduled meeting.

46. a. On October 3, 1980, another meeting was held between Sterling-Kates (Messrs. Pearlman, Polton, McDermott, Carlotti and Sheehan) and GSA (Messrs. Manley, Shulman, Kelly and Martin).[22] Mr. Dario, the landowner and optionor, was present and represented by Mr. Bucci, his attorney, and by Mr. Paquin.

b. At the October 3rd meeting, the Agreement was presented to the landowner, Mr. Dario.

c. At the meeting, many of the same problems were discussed including clearing the site, tenant eviction, and sewer easements.

d. Mr. Bucci, a representative of the landowner Dario, reviewed the terms of the Option Agreement and noted inter alia, that, an easement across Dario's property for sewers would not be given.[23]

e. Mr. Sheehan, on Mr. Pearlman's behalf, said that because many matters remained unresolved, plaintiff was not prepared to sign the Lease Agreement.

Whereupon, the government said it intended to tender a default.

f. Plaintiff's representative Mr. Pearlman wrote "void" on the signatures of himself and Mr. Kelly of GSA which had been placed earlier on the Option Agreement. (Counsel for Sterling-Kates and GSA, Messrs. Carlotti and Manley respectively, agreed to the voiding of the document.[24])

g. With this conclusion of the meeting, Mr. Bucci, Dario's attorney, was heard to have made some statement indicating Mr. Dario's willingness to execute the document, but the meeting adjourned nonetheless without completing the Option Agreement.

49. a. All negotiations between GSA and plaintiff appear to have dissolved by October 3, 1980.

At or about this time, Mr. Pearlman requested that GSA permit Sterling Engineering to perform the contract, but this request was denied.

b. In early or mid-September, Erie Savings withdrew its conditional financing commitment. A Substitute commitment, from Aetna Business Credit in New York, was not obtained until after October 3rd.

50. a. On October 9, 1980, the GSA contracting officer issued a final decision finding plaintiff in default of contract for failing to execute the lease agreement.

b. As an alternative basis for holding plaintiff in default, the contracting officer found that plaintiff had been unable to produce satisfactory evidence of substitute conditional commitment of financing.

## OPINION

The plaintiff contends that no contract came into being as a result of the parties' actions in the course of this negotiated procurement. Defendant, on the other hand, argues that a contract was awarded and came into being upon defendant's acceptance of plaintiff's offer; defendant contends that plaintiff defaulted in its performance by failing to execute contract documents and begin construction.

Plaintiff contends, in the alternative, that even if a contract were to have existed, any non-performance by plaintiff was justified in view of government misrepresentations

---

**22.** It was by this date that the government had proclaimed, in its letter of September 24, 1980, that the lease be executed or it would hold the contractor in default.

**23.** Sterling-Kates was aware of economically feasible alternatives in the event they would be unable to obtain a sewer easement across the adjacent property owned by Mr. Dario. How-

ever, while the absence of an easement would not prohibit continuation of the project, it would make the project more costly.

**24.** In the absence of all four participants and signatories to the Agreement, the document may well have been void in any event.

made in the course of the contract-award process (specifically with respect to the content of the options to purchase the site). Indeed, plaintiff seeks compensation for costs incurred (particularly in connection with its bid preparation) as a result of these misrepresentations.

Finally, defendant also contends that plaintiff was in default in failing to secure the necessary financing commitments as required by the Solicitation.[25]

## Misrepresentation

Plaintiff claims that it was justified in not performing the contract, if indeed a valid contract had come into being, by reason of the government's misrepresentations during the contract-award process.[26]

Plaintiff's arguments address the doctrine of "misrepresentation", namely: that the government provided inaccurate data insofar as the land-acquisition options were concerned.[27]

As a necessary element in a claim of misrepresentation, plaintiff argues that it relied upon government characterizations of the options as "standard" when plaintiff prepared its proposal and that this characterization was inaccurate. However, evidence at trial established only that options may be "standard" in their format. The evidence did not establish that any specific treatment, terms, or provisions were "standard". Moreover, there is no showing that the actual options were deficient in matters of form so as to adversely impact upon the preparation of plaintiff's proposal.[28] Thus, the plaintiff has not met the requirement that it establish "reliance" upon the government representations (as to the options being "standard"). *See Associated Traders v. United States*, 144 Ct.Cl. 744, 169 F.Supp. 502 (1959).

Rather, the gravamen of plaintiff's complaint appears to be that the substance of the options did not resolve certain matters (such as the existence of tenants—of which plaintiff was nonetheless aware prior to

**25.** The Solicitation required that, after submitting an offer and before award, plaintiff was required to furnish evidence of conditional financing. *See* Finding 12.e. Plaintiff did provide such information on August 6, 1980, thus complying with the Solicitation to this extent.

Additionally, the record supports a Finding (see No. 29) only to the effect that this commitment was withdrawn in early to mid-September 1980. The alleged award of the contract was on September 18, 1980. Therefore, with respect to the relevance of the withdrawal, if it occured prior to the award date, it may be questioned whether the withdrawal rendered the plaintiff's proposal non-responsive to the solicitation and rendered plaintiff ineligible for any contract award. However, in view of the resolution of this case on other grounds, it is not necessary to resolve this issue.

**26.** In addition, plaintiff seeks reimbursement of the costs it incurred, particularly in the preparation of its bid, by virtue of this misrepresentation.

**27.** Plaintiff does not rely upon the doctrine of "superior knowledge", *i.e.*, a failure of the government to disclose information which it possesses, which is vital to the successful completion of the contract, and which it is unreasonable to expect the contractor to obtain from other sources. *See, e.g., H.N. Bailey & Assoc. v. United States*, 196 Ct.Cl. 166, 177-78, 449 F.2d 376, 382-83 (1971).

Certain elements of such a claim may be present here. For example, with respect to the availability (or lack thereof) of the sought-after information, it was acknowledged that the options were not publicly recorded. Moreover, as suggested in the footnote to Finding 15.d., it appears that the government was aware that the landowner/optionor was also unlikely to provide the information to the plaintiff. However, this is not enough, in and of itself, to confer merit upon plaintiff's claim.

Crucial to any such claim here is the government's obvious efforts, in the Solicitation, to inform and alert the offerors that such options existed and that acquisition of the land necessary to construct the building would be governed by such options. (Thus, the instant situation is the reverse of that present in *Helene Curtis Ind. Inc. v. United States*, 160 Ct.Cl. 437, 312 F.2d 774 (1963)). Although the precise terms of the options were not provided, the offeror was clearly on notice of the existence of the information; knew or should have known that such terms could affect its proposal; and prepared the proposals as the result of its reasoned decision to do so even in the absence of the precise terms.

**28.** For example, the actual options may not have been accompanied by a "Memorandum of Option" as described by plaintiff's witnesses as a "standard" element. Nonetheless, it has not been shown that this omission was in any material, or that it in any way affected plaintiff's proposal or the ability to exercise the option.

submitting its proposal—and the matter of their eviction), and, more importantly, that the matters were not resolved in the manner plaintiff would have desired (*e.g.*, that the land acquired by exercise of the options would be free and clear of tenants).

Even if it might be reasonable to expect a "standard option" to address the matter of existing tenants—which is not established in the evidence concerning the alleged format of "standard options"—plaintiff could in no way reasonably infer that the resolution would be as it hoped. Perhaps more to the point, plaintiff cannot complain that, since plaintiff's inferences turned out to be unfounded in fact, the government had mispresented the facts to plaintiff. *See, e.g., Rough Diamond Co. v. United States*, 173 Ct.Cl. 15, 351 F.2d 636 (1965), cert. denied 383 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966).

Thus, it is determined that plaintiff's contentions in this regard are without merit.

### *Formation of Contract*

We turn now to the central issue in this case, namely: whether a valid contract ever came into being. There is no overall rule governing the formation of a contract except that a contract may be reached in any manner sufficient to form an agreement.

It is the intent of the parties which is determinative; a contract exists only if the parties mutually intend to be bound (either in fact or in law under the terms of, for example, an advertised competitive solicitation). *See, e.g., Russell Corp. v. United States*, 210 Ct.Cl. 596, 537 F.2d 474 (1976), cert. denied 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977); *Saul Bass & Assoc. v. United States*, 205 Ct.Cl. 214, 505 F.2d 1386 (1974); *see also Prevado Village v. United States*, 3 Cl.Ct. 219 (1983).

When procurement is by advertising, for competitive bids, the government issues an Invitation for Bids or a Solicitation for Offers. The bids received constitute offers, are generally publicly opened at a stated time, and thereafter the government's ac-

ceptance of an offer (responsive to the invitation and submitted by a responsible bidder) brings a contract into being.

Somewhat different procedures are followed in negotiated contracts. The government usually proceeds by issuing a Request for Proposals (RFP) or Request for Quotations. This is in essence an invitation to submit proposals subject to further negotiation.

Whether the negotiations consist of a series of "proposals" or a series of "offers" and "acceptances" of some or all of the necessary terms may be a matter of semantics with no significance as a matter of law. It is important to note, however, that here the terms "offer" and "acceptance" were used in the context of a contract to be arrived at by negotiation, and not as those terms are more customarily used in advertised competitive procurements where the bid is an offer and a contract exists upon government acceptance upon (or shortly after) bid opening.

A contract is formed at the conclusion of negotiations when the parties have reached a meeting of the minds. (Frequently, the government advises the contractor of this event by forwarding a document reducing all agreements to writing. When the contractor executes this document, and returns it to the government, it submits its final proposal or "offer". Execution by the government then constitutes the government's "acceptance" of the proposal.)

■ The government argues in this case that a contract was established when it issued its letter of September 18, 1980, informing plaintiff that its "offer" had been "accepted" by the government. The terms of the final contract were to be the same as those in the proposed Lease Agreement forwarded under letter of September 3, 1980,[29] with one modification; the September 18, 1980, letter proposed a different occupancy provision and date. No Lease Agreement was prepared or forwarded with the September 18th letter, although the letter stated that the Agreement was to be signed immediately. (Pre-

---

**29.** The September 3rd letter stated that it did not constitute a contract or a notice of award.

It, in essence, reduced to writing the agreements perceived as being reached to that time.

sumably, the government may have intended that plaintiff make the necessary modification on the document furnished by the September 3, 1980, letter—rather than the government preparing the new document.)

Whether this conduct resulted in the existence of a valid contract or whether it merely represented another in the series of negotiations (with proposals, offers and counteroffers) must be determined in the context of the entire procurement. Defendant's reliance here upon the semantics used in September 18th letter, namely that a contract had been awarded when plaintiff's "offer" had been "accepted", would have true meaning only in the context of an advertised competitive procurement.

Indeed, following the issuance of the September 18th letter, the parties continued to negotiate, as shown by the plaintiff's letter of September 25th and a meeting on September 26th. The result of such further exchanges was the further agreement on some, but not all, of plaintiff's proposals. This is evidenced by the preparation of a document designated as the [Final] Lease Agreement, which, although dated September 18, 1980, contained many provisions not incorporated by the September 18th letter.[30] (Indeed, even after the preparation of that "Lease Agreement", the parties continued to meet and prepare additional agreements on October 1 and 3, 1980.) Thus, it cannot be said that agreement had been reached or a contract awarded by virtue of the September 18, 1980, letter. *See, e.g., Baltimore & Ohio R.R. v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1923); *Prevado Village v. United States*, 3 Cl.Ct. at 225.

Finally, as can been seen by the events of October 3, 1980, while the parties were in the process of negotiating a final agreement—and resolving issues raised by plaintiff—the government announced that negotiations were concluded and, absent execution of the Lease Agreement (presumably that date September 18, 1980), the contractor would be terminated for default. At no time were negotiations completed.

Thus, at no time did a contract exist.

## CONCLUSION OF LAW

Based on the foregoing, it is found that there was no misrepresentation or other breach by the government in connection with its solicitation and negotiation. Accordingly, the petition (particularly paragraphs 30 and 31 in Count II) is to be dismissed with prejudice.

It is further found that the government's determination that plaintiff was in default was improper inasmuch as no contract had come into being. Accordingly, there being neither a contract nor a valid default termination, the defendant's Counterclaim is to be dismissed with prejudice.[31]

Plaintiff's request for attorneys' fees and expenses is not considered as a part of this opinion but is more properly to be considered upon the filing of any Application for fees and expenses pursuant to RUSCC 81(e)(1).

No costs.

---

**30.** Nor could it be successfully argued that these new and additional provisions constituted technical "modifications" to the contract which allegedly came into existence on September 18th. They were not set out in separate documents, to be executed over and above the execution of the initial governing contract. (Indeed, if the initial Agreement bore the date of September 3rd, as modified in the letter of September 18th, these modifications were presumably arrived at thereafter.) Instead, these new additions were set forth in a fully integrated Lease Agreement including both the original terms and the agreements reached after September 18th. Thus, if indeed the letter of September 18th purported to set forth a proposal based on agreements reached to date, then the Lease Document dated September 18th (but presumably prepared thereafter) constituted not a modification but yet another or counter-proposal.

**31.** Plaintiff's allegations in its Petition and its Answer to defendant's First Amended Answer (Count I and particularly paragraphs 25 and 26) have been found to be supported by the evidence. This is reflected in the court's action with respect to defendant's counterclaim. Accordingly, no additional relief being sought by plaintiff, Count I of the petition may be dismissed as moot.