ESSEN MALL PROPERTIES, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 148–89C.

United States Claims Court.

Sept. 17, 1990.

---

Felix R. Weill, Baton Rouge, La., for plaintiff.

C. William Lengacher, Washington, D.C., with whom were Asst. Atty. Gen. Stuart M. Gerson, Director David M. Cohen, and Asst. Director Robert M. Hollis (Gerald J. Robinson, Office of Contracts and Property Law, U.S. Postal Service, of counsel), for defendant.

## OPINION

LYDON, Senior Judge:

This government contract case is before the court on the government's motion to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted, for lack of subject matter jurisdiction and, alternatively, for summary judgment. Plaintiff opposes this motion on the basis that a valid and binding contract exists between the parties. The issue in this case is whether a contract, express or implied-in-fact, came into being as a result of negotiations between plaintiff and the Postal Service relative to the lease of space for use as a postal facility in a mall owned by plaintiff. After carefully reviewing the submissions of the parties, and following oral argument, the court concludes that defendant's motion for summary judgment should be granted.

## FACTS

In 1986, certain structural changes were made in the organization of the United States Postal Service, which precipitated personnel changes at the management level. Four main Postal Service office divisions are pertinent to this case: the National Office, located in Washington, D.C.; the Regional Office, located in Memphis, Tennessee; the Division Office, located in Jackson, Mississippi; and the Management Sectional Center (MSC), located in Baton Rouge, Louisiana. Most of the activities surrounding this case took place in the MSC office, the bottom rung on the Post Office organizational ladder.

On October 31, 1985, Henry Jackson, Acting Manager of the MSC, and the Postmaster at Baton Rouge until April 1986, requested that the Memphis Field Real Estate and Building Office (FREBO) lease 4,400 square feet of net interior space for a retail postal station in Baton Rouge, Louisiana, to be known as Staring Finance Station. Jackson's proposal was a temporary measure to relieve overcrowded conditions at the Southeast Station in Baton Rouge. A retail station is a postal facility that sells stamps, receives mail and provides other postal services, but does not include serving mail carriers. This proposal was approved by D.T. Bailey, District Manager in the Jackson office.

Plaintiff Essen Mall Properties (Essen), a general partnership, first learned in November 1985, through one of its general partners, William Gremillion (Gremillion), that the Postal Service was looking for a new location in Baton Rouge, by speaking with Tannor Dupard (Dupard), a Delivery and Retail Analyst for the Postal Service. Dupard told Gremillion to contact J. Kenny Griffin (Griffin), a Real Estate Specialist for the Postal Service in Memphis, for further information. Plaintiff contends that it began discussions with the Postal Service in November 1985 concerning the Baton Rouge project, at which time plaintiff was told that its newly-constructed shopping mall (Essen Mall) was located in the geographical area thus qualifying it as a potential bidder for any new postal facility.

On January 7, 1986, FREBO issued an Advertisement for Bids for Space (bid invitation), which identified the preferred area as bounded on the north by Interstate 10, on the south by Alberta Avenue, on the east by Madeira Avenue, and on the west by Kenilworth Avenue. Essen received a bid package in January 1986 containing the bid invitation from the Postal Service. The bid invitation specified 4,440 square feet of enclosed area for a basic lease term of ten years.

Having determined that Essen Mall was located within the preferred area, Essen submitted a bid to the Postal Service on January 23, 1986, to lease 4,971 square feet of space in Essen Mall, for a basic lease term of ten years at $10.94 per square foot. Essen's bid was the only one received by the Postal Service in response to the bid invitation.

In November 1985, Charles Smith, the FREBO manager in Memphis, who had contracting authority, assigned Griffin to be project manager on the Essen Mall project. Griffin was responsible for solicitation of the leased space, for conducting negotiations with Essen, and for coordinating renovation work with the Postal Ser-

vice's Design and Construction branch.[1] At various times throughout the project, Griffin reported to Charles Smith (contracting officer through December 31, 1985), Phillip Ferrari (acting contracting officer from January 1, 1986 to March 31, 1986), and Larry Herndon (acting manager of Real Estate Management branch (formerly FREBO) in Memphis from April 1, 1986 to July 19, 1986, and contracting officer from July 21, 1986). During the gap in contracting officers from April 1, 1986 until July 21, 1986, Earl Martin, general manager of FREBO in Memphis, had contracting officer authority.

On or about February 11, 1986, Gremillion met with two Postal Service representatives, Dupard and Griffin, during which time the parties discussed a five-year lease at a price of $11.75 per square foot for 6,000 square feet of space ($70,000 per year), with the further stipulation that the Postal Service would complete interior tenant improvements beyond the shopping mall's shell structure, although the cost of such improvements was not discussed. The reduction in the term of the lease from a basic ten-year term to a basic five-year term indicates that the Postal Service looked on the Essen Mall project as a temporary measure and thus was leery about putting too much money into the project. In his deposition, Griffin indicated that the 6,000 square foot figure was discussed at that meeting, but was not agreed upon, since Griffin had no authority to increase the space requirements. The materials at hand indicate that neither Dupard nor Griffin had contracting authority. Nevertheless, at this point plaintiff contends it was

led to believe from the conduct of the above Postal Service employees, and in light of the surrounding circumstances, that the parties had reached a binding agreement to lease.

In March 1986, D.T. Bailey, district manager in Jackson, wrote to the regional office in Memphis, requesting that the space for the proposed retail facility be increased from the 4,440 square feet advertised in the bid invitation to 6,000 square feet to relieve overcrowding at the Southeast Station, and to accommodate thirteen mail carriers. The Postal Service met with Gremillion to discuss increasing the space requirements, rental costs for a larger space, and the cost of a five-year option. Such activities clearly indicate that, as of early March 1986, there was no agreement to lease. Plaintiff contends that the five-year renewal rate was agreed upon at $14.75 per square foot, and that a cancellation clause was also agreed upon which gave the Postal Service the right to terminate the lease after the first two years of the option period.

Griffin wrote a letter on March 14, 1986 to Gremillion, which states, in pertinent part, as follows:

> To confirm our previous conversations, it is the Postal Services [sic] intention to lease the space your partnership has offered. *Several items must be approved and agreed upon between the two parties prior to any signed contract. Mainly, final approval of your offer, cost of improvements (plans being designed at this time), and mutual agreement of drawings and construction.* (Emphasis added)[2]

1. In his deposition, Griffin stated that he had the *right* to negotiate leases for the Postal Service, but not the *authority* to do so. (Emphasis supplied) In other words, any agreement reached as a result of such negotiations by Griffin was subject to the approval of the contracting officer. Griffin only had authority to make recommendations relative to any negotiations he conducted on behalf of the Postal Service.

2. In his deposition, Griffin stated that he sent the above-quoted letter in response to Gremillion's request that the Postal Service send a letter to Essen's permanent lenders assuring the lenders that the Postal Service would be a ten-

ant in Essen Mall. However, Griffin stated that "[the Postal Service] could not assure at that point because there was too many contingencies that had to be corrected before we could enter into any kind of an agreement." It is interesting to note that Griffin in his letter of March 14, 1986, quoted above, advised Gremillion, at his request, of the Postal Service's "intention" to lease. Plaintiff made a similar request in May 1986, to which Earl Martin, then acting as a contracting officer, responded on May 23, 1986. An excerpt from this letter appears in the text *infra*. The May 1986 request would seem to indicate that plaintiff and/or the financial institution felt that a letter signed by Griffin lacked

In his deposition, Larry Herndon described his position as that of contracting officer for all postal facility leases in Louisiana since September 1986. He also deposed that Griffin had no contracting officer authority at any time during the Essen Mall project. Plaintiff admits that Herndon had been involved in the Essen Mall project negotiations from the outset, but plaintiff alleges that Griffin assured Gremillion that Griffin had contracting authority and was able to bind the Postal Service in the lease with Essen. Griffin's deposition denies giving Gremillion any such assurances. The materials before the court show beyond cavil that Griffin had no contracting authority to enter into leases on behalf of the Postal Service.

In April 1986, Essen was advised that the architects for the Postal Service had been given verbal authorization to begin thirty-five percent working drawings on the project. Plaintiff met with the architects at the proposed site, which consisted of merely a shell structure in Essen Mall, with a dirt floor, one enclosed wall, and no plumbing or wiring. The architects met with a representative of the Postal Service to discuss details of the project. In his deposition, Gremillion states that he received permission from both Dupard and Griffin to advertise, in an annual commercial and industrial real estate report, that the Postal Service would be a tenant in the mall. Essen maintains that at this time Griffin told Gremillion that the lease would be signed after the architect submitted the thirty-five percent working drawings. Defendant disputes plaintiff's contention that the Postal Service gave plaintiff permission to advertise the fact that the Postal Service would be a tenant in Essen Mall. The depositions of relevant Postal Service personnel clearly show that none of those personnel authorized any such advertisement.

On May 13, 1986, the Postal Service's Southern Region Capital Investment Committee approved leasing 6,000 square feet of space from Essen at an annual rent of $70,500, in response to D.T. Bailey's March 12, 1986 request for regional approval to proceed with a 6,000 square foot lease to house a full classified station (retail plus 13 carriers) to alleviate crowded conditions at Southeast Station until a new facility could be built to satisfy long-term needs. The Committee also approved a one-time space alteration cost of $125,000. It appears that such Committee approval was required before any appropriate Postal Service official would be empowered to bind the Postal Service to a lease agreement.

In May 1986, plaintiff requested a letter from the Postal Service indicating its intention to lease space in Essen Mall, as required by the financial institution from which Essen was attempting to obtain its permanent loan on the shopping center. In response, the Memphis FREBO manager Earl Martin, who had contracting authority, sent a letter to Gremillion, dated May 23, 1986, which states as follows:

> This is to confirm the U.S. Postal Service's interest in the bid proposal of Essen Mall Shopping Center *subject to final drawings and cost estimates.* This is based on a 6,000 square foot free standing building indentified [sic] as "Building E" for a primary term of 5 years at $11.75 per square foot and an option of 5 years at $14.75.... U.S. Postal Service will pay tenant improvements *subject to specifications agreed to by both parties.* (Emphasis added)

Plaintiff claims it entered into the permanent loan arrangement based on its agreement with the Postal Service that it would be a tenant, that plaintiff spent $513,002.57 to close the permanent loan, and that plaintiff would not have entered into the permanent loan but for the Postal Service's assurances.

On May 19, 1986, representatives of the Postal Service met with representatives of Chenevert/Soderberg, Inc., the Postal Service's architects, to review preliminary floor plans in preparation for the issuance of a solicitation for the construction work necessary to convert the Essen Mall space into a retail postal station. At this meeting, the architects noted that they had been given verbal authorization, on May 16,

the authority that one signed by a contracting officer possessed.

1986, to proceed with the thirty-five percent drawings. In June, the architects submitted drawings, plans and specifications, and preliminary cost estimates totalling $187,100.

On July 3, 1986, Gremillion sent a letter to Phillip Ferrari, a FREBO manager in the Memphis regional office, that stated in pertinent part as follows:

I would like to bring to your attention several delays that have transpired. The approval of the proposed lease was delayed by a U.S. Postal Service Committee because the internal forms were not properly completed. Then the next Committee meeting was cancelled due to the lack of a quorum. Once the lease proposal was approved, I was told that the architect, Norman Chenevert, was issued a work order to proceed with the 35% working drawings to be submitted with a cost estimate for the completion of the tenant improvements. The architect did not receive his work order until June, approximately two months after he should have. At this time, Mr. Griffin stated that once the Postal Service received the 35% working drawings along with the cost estimates that the lease could be signed. (Now I am being told that the lease will be signed when the final plans are completed and that the construction bids for completion are received).... *I appeal to your sense of fair business practice to bring to a conclusion the representations made by your staff members. This includes signing the lease as originally represented, completing the plans and specifications in a timely manner, and finally, supply the owners with an anticipated opening date so we can make budget projections for our investors.* (Emphasis added)

In another letter to Ferrari, dated July 25, 1986, Gremillion again implored the Postal Service to sign the lease:

In reference to my letter of July 3, 1986, I received a telephone call from Kenny Griffin and the architect on the [Staring Finance Station] project. Mr. Griffin stated the architect had been given the authorization to complete the final plans and specification. If you had anything to do with this accomplishment, it is appreciated very much.... However, I have not yet been advised of other matters discussed in my July 3 letter. *Namely, when the lease can be signed and an anticipated opening date.* (Emphasis added)

The architects for the Postal Service submitted final plans on August 11, 1986, including a final cost estimate of $171,896. Also on that date, Griffin sent Gremillion a letter stating, in pertinent part: "[I]t is my understanding that you will send me a completed copy of our lease agreement this week and that *it is the Postal Service intention to commence lease payments on the same day that the construction bid is awarded."* (Emphasis added)

By letter dated August 15, 1986, Griffin sent Gremillion an original and two copies of an Agreement to Lease, all unexecuted. The letter states, in pertinent part:

Annual rental of $70,500 has been approved for the basic term of five years.... Any rental above $70,500 is not authorized; further delays would occur in obtaining an increase, possibly endangering the project.... Please review, sign and return the original and one copy to this office. *This agreement is to be executed after awarding a construction contract on the improvements. Said improvements are being finalized at this time.* (Emphasis added)

Plaintiff contends that this letter was sent by direction of, and with approval of Larry Herndon, the contracting officer, and thus the letter constitutes a written and binding agreement.

Plaintiff executed the lease agreement and returned it to the Postal Service on August 19, 1986. The Supplement to the lease agreement stated, in paragraph 12, that "*[t]his offer will be accepted contingent upon the Postal Service receiving an acceptable construction/improvement offer.... If successful bid is awarded, this Agreement will then be accepted and rental will begin."* (Emphasis added) The

next sentence was added and initialled by Gremillion: "Rent shall commence on the first of the month after awarding the bid, but no later than October 1, 1986."

On September 12, 1986, the Postal Service issued a Bid Invitation for construction work on the existing building shell at Essen Mall. The Bid Invitation reflected an estimated cost range of $125,000 to $175,000. The lowest bid the Postal Service received when the bids were opened on October 2, 1986 was $199,870.

The Postal Service authorized $125,000 for construction work on the Essen Mall space. The Postal Service's Real Estate and Building Services Request, dated September 25, 1986, states that the Regional Capital Investment Committee approved "a one-time modification cost of $125,000." The Request also states that the contracting official has authority to "acquire these services, commit funds, and to make expenditures provided they do not exceed" the authorized amount of $125,000. Plaintiff disputes the $125,000 figure, pointing out that the September 12, 1986 Bid Invitation for tenant improvements states that "the estimated cost range is between $125,000 and $175,000." It is clear, however, that the Postal Service had received approval only for $125,000 as modification cost expenditures. Any cost expenditures over $125,000 would require Committee approval. Plaintiff's position, in this regard, is that the $125,000 cost limitation was unrealistic since subsequent studies showed a range of estimates in excess of the $125,000 figure. The original estimate for construction work was thought to be acceptable at the time it was made. However, it was subsequently found to be too low for the improvements sought. The materials before the court are unclear as to whether the improvements considered necessary when the $125,000 estimate was made remained the same when the subsequent and higher estimates were made. The significant fact, however, is that the solicitation took into account the higher estimates by its "estimated cost range" figures.

Plaintiff contends that during August and September 1986 the Postal Service continually assured plaintiff that there were no problems with the lease and that rental payments would begin in October 1986, even before construction if construction had not begun by then. The Postal Service's Larry Herndon stated in his deposition that in early October of 1986, Jerry Garth, Manager of Support Services in the Jackson division office, expressed concern about the substantial cost overruns during the course of discussions regarding whether to continue with the Essen Mall project. According to Herndon, Garth told Herndon that there had been a change in thinking regarding the size of the facility needed. In his deposition, Garth indicated that such factors as high costs associated with necessary modifications to the existing shell structure played a major role in the Postal Service's decision not to become a tenant at Essen Mall, along with potential parking and vandalism problems due to the cinema next door. These concerns were expressed in a March 13, 1987 memorandum from D.T. Bailey to Jerry Adkins, who was at the time general manager of the Real Estate Division in the Memphis regional office. The memo cited, in addition to cost problems, parking, security, safety and environmental problems with the Essen Mall location.

On October 3, 1986, plaintiff was first informed by the Postal Service that the new Postmaster in Baton Rouge would make a decision on the cost of improvements. According to plaintiff, the Postal Service advised plaintiff that the only problem was cost, but that the cost could be reduced to fall within the range of estimates made by the architects and the Postal Service. Plaintiff also contends that the Postal Service told plaintiff that, although it was waiting to hear from Baton Rouge, the Postal Service would sign the lease and begin lease payments immediately.

Essen met with the Postal Service on October 16, 1986 to discuss changes in the plans and specifications for the tenant improvements and, plaintiff alleges, to reduce costs. Plaintiff contends that no one told Essen at this time that the job would not be

completed or that the lease would not be honored by the Postal Service. Essen told the Postal Service that Essen would complete the facility and perform the work for the approved cost figure.

On October 17, 1986, the Postal Service told Essen the deal was off because of the estimated cost. Plaintiff contends that the Postal Service refused to give an approved cost figure, even though Essen had assured the Postal Service that Essen would pay any cost overrun. Plaintiff claims it was later advised by representatives of the Postal Service that the Postal Service had merely changed its mind about leasing the property, and that the decision was unrelated to cost. By letter dated November 7, 1986, contracting officer Herndon informed Gremillion that Essen's offer to lease space in Essen Mall was declined "based upon operational and cost factors." On February 5, 1987, Jerry Adkins wrote a letter to the Postal Service headquarters in Washington, D.C. In the letter, Adkins noted that:

> the Baton Rouge MSC Manager, Director of Customer Services, and the Division Support Services Manager had all changed since the initiation of the [Essen Mall] project and the new managers were not in favor of proceeding. In addition to the higher than estimated and approved renovation cost, it is my understanding the new management team in Baton Rouge did not like the Essen Mall space and was not in agreement with the basic concept.

Although discussions continued between the parties for several months, those discussions ended in March 1987 when the Postal Service indicated that it would no longer reconsider its decision.[3]

The Postal Service never used any space in Essen Mall and it never began any tenant improvements. Plaintiff contends that it held open the allotted space in the mall for the Postal Service's use, in accordance with the alleged agreement between the parties, the same as if the Postal Service had actually used the space.

Essen contends that a valid and binding express written lease exists between the Postal Service and Essen for five years at $70,500 per year. Essen contends in the alternative that there is a valid and binding implied contract of lease, based on a meeting of the minds, inferred from the conduct of the parties, and in light of the surrounding circumstances. In the alternative, Essen contends that the Postal Service representatives had the authority to enter into a lease, or alternatively, that they were clothed with apparent authority, and they represented that all committees had approved the project. Essen alleges that it reasonably relied on those representations to its detriment by reserving space for the Postal Service, by representing to prospective tenants that the Postal Service would be a tenant in the shopping mall, and by taking other detrimental actions which have caused it substantial damage. Essen's complaint alleges tortious breach of contract, business tort, negligent misrepresentation and breach of business and contractual duties.

**3.** In a memorandum to file written by Jerry Adkins, general manager of the real estate division in the Memphis regional office, dated February 24, 1987, Adkins memorialized and summarized these subsequent discussions:

> On Thursday, February 19, 1987, Larry Herndon, Manager, Realty Management Branch, and I inspected the space at Essen Mall which we had been authorized to lease as a classified station, but which the Baton Rouge MSC and Jackson Division have now decided they do not want because it does not represent an acceptable temporary solution to their operational needs in the area.... It subsequently developed that the alteration cost estimate [of $125,000] was low. An advertisement for construction bids issued on September 12,

1986, produced a low bid of $199,870. The Jackson Division advised that it did not wish to proceed at the higher cost, asserting that ... the project would not provide the needed relief for Southeast Station.... Because of the internal location of the space [in Essen Mall], less-than-desirable accessibility, less-than-adequate dock, and probable inadequacy of parking area (note the multi-screen theater), it was our conclusion that it would not afford a good location for a classified station. However, we do feel it would be acceptable as a temporary finance unit.... [T]he Essen Mall space would be a poor location for a classified station ... [and a] ... 24,000 sq. ft. facility would be a far superior interim solution to the operational needs in the area.

In April 1987, Essen filed an action against the Postal Service in the United States District Court for the Middle District of Louisiana, alleging breach of contract and negligent misrepresentation. On September 9, 1987, the district court dismissed plaintiff's complaint for lack of subject matter jurisdiction, but suggested that plaintiff might file a claim with the Postal Service's contracting officer.

On January 18, 1988, Essen submitted a claim for $1,462,767.57 (plus an undisclosed sum for loss of value to the shopping center) to contracting officer Herndon, who denied plaintiff's claim on March 14, 1988, for the following reasons: First, the lease agreement was contingent on the Postal Service's receipt of an acceptable construction/improvement offer. Second, only $125,000 was authorized for the construction work, and the lowest bid received was $199,870. Third, the lease agreement was never signed by the Postal Service.

Essen appealed the contracting officer's decision by filing a complaint in this court on June 27, 1988 (No. 371–88C), alleging tortious breach of contract, negligent misrepresentation and breach of business and contractual duties, and seeking total damages of $3,818,002.57.[4] Essen's complaint was dismissed by this court on October 25, 1988, for lack of subject matter jurisdiction, since plaintiff had failed to certify its claim, as required by the Contract Disputes Act of 1978, 41 U.S.C. § 605(c)(1), before submitting it to the contracting officer.

On December 16, 1988, plaintiff submitted a certified claim to Herndon, the contracting officer, seeking the same amount of damages on the same legal theories as in its prior Claims' Court complaint. Herndon denied plaintiff's certified claim on February 6, 1989, for the same reasons cited in his previous decision. Plaintiff again appealed this decision by filing the instant action in this court on March 21, 1989 (No. 148–89C), seeking the same amount of damages based on the same legal theories as in its prior Claims Court action.

On November 3, 1987, the Postal Service issued another Bid Invitation for existing space in which to locate a "post office station," seeking net enclosed space of 12,000 to 18,000 square feet. The preferred area was described in the invitation as being bounded on the north by Interstate 12 and Highway 73, on the south by Highland Road, on the east by Airline Highway, and on the west by Essen Lane and Staring Lane. The Bid Invitation sought a basic lease term of five years with two five-year renewal options. The invitation resulted in the execution of a lease agreement between the Postal Service and the lessor, Gay Juban, on October 4, 1988, for the lease of approximately 18,520 net interior square feet of a steel building, with a basic lease term of ten years at $182,422 per year, to be known as "Commerce Park Station." The materials before the court are silent as to the price per square foot of this contract, but the figures suggest a price of $9.85 per square foot, as compared to plaintiff's bid of $11.75 per square foot.

Defendant has filed a motion to dismiss plaintiff's complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. Alternatively, defendant has moved for summary judgment on the ground that no material factual disputes exist. During the course of discovery, defendant filed a motion to quash plaintiff's ten subpoenas to take witness depositions, and to stay discovery pending resolution of defendant's dispositive motions. Giving plaintiff the benefit of the doubt, the court denied defendant's motions to stay discovery and to quash the subpoenas, allowing plaintiff to proceed with discovery of evidence which plaintiff has presented here in support of its opposition to defendant's pending dispositive motions. Plaintiff opposes these motions by setting forth three alternative bases for its contention that a contract to lease came into being binding the Postal

---

4. Plaintiff's damages are itemized in its complaint as follows: loss of rental for initial five-year term: $352,500; loss of rental for first five-year option term: $442,500; tenant improvements: $150,000; permanent loan closing costs: $513,002.57; loss of value to shopping center: $2,300,000.

Service. Plaintiff alleges the existence of either an express or an implied-in-fact contract, or alternatively, that the government should be equitably estopped from denying the existence of a contract implied-in-fact.

## DISCUSSION

This case is before the court on defendant's motion to dismiss plaintiff's contract claims for failure to state a claim upon which relief can be granted, pursuant to RUSCC 12(b)(4), and to dismiss plaintiff's negligent misrepresentation and business tort claims for lack of subject matter jurisdiction.[5]

Defendant has moved, in the alternative, for summary judgment. "Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to relief as a matter of law.... [I]nferences drawn from the facts 'must be viewed in the light most favorable to the party opposing the motion.'" *Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

In this procedural posture, the issue before the court is whether a contract, either express or implied-in-fact, arose between the parties. An express contract "must be manifested by words, either oral or written, which contains agreement and/or mutual assent.... An implied-in-fact contract, on the other hand, 'is one inferred from the circumstances or acts of the parties.'" *Webster Univ. v. United States*, 20 Cl. Ct. 429, 433 (1990) (quoting *Algonac Mfg. Co. v. United States*, 192 Ct.Cl. 649, 674, 428 F.2d 1241, 1255 (1970)).

Defendant argues, in its motion for summary judgment, that no contract exists between the parties, either express or implied-in-fact, because the contract was conditioned on an event that never took place, that is, the Postal Service's receipt of an acceptable bid for tenant improvements.

In addition, defendant argues that some of plaintiff's damage claims, *i.e.*, loss of business reputation, loss of prospective rent revenue, loss of revenue due to lower rent levels, general impairment to marketability of Essen Mall, and permanent loan closing costs are, in any event, too remote and speculative to be recovered.

Plaintiff opposes defendant's to dismiss, alleging it has established that a contract, either express or implied-in-fact, exists between plaintiff and the government. Further, plaintiff argues that the government should be equitably estopped from denying the existence of a contract. In opposition to defendant's motion for summary judgment, plaintiff alleges the existence of material factual disputes. Plaintiff seeks damages in the total sum of $3,818,002.57.

I. Express Written Contract

A. *Offer and Acceptance*

■ This case involves basic principles of contract formation, that is, offer and acceptance. The Restatement (Second) of Contracts § 24 defines "offer" as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Section 50 defines "acceptance" of an offer as "a manifestation of assent to the terms thereof made by the offeree in a manner invited by the offer." The materials before the court clearly show that the Postal Service never manifested an unconditional acceptance of Essen's offer to lease space.

In essence, plaintiff seems to argue that an express written contract came into being when the Postal Service issued its bid invitation to lease existing space, which plaintiff views as an "offer" that plaintiff "accepted" by submitting its bid. However, case law makes clear that an invitation for bids issued by the government constitutes a solicitation for an offer; the

---

5. In an unpublished order dated February 22, 1990, the court indicated that plaintiff's tort claims had a sufficient nexus to plaintiff's contract claims to survive defendant's motion to dismiss for lack of subject matter jurisdiction. In addition, the court indicated that plaintiff had alleged facts supporting its contract claims sufficient to survive defendant's motion to dismiss for failure to state a claim upon which relief can be granted. Accordingly, the remaining matter before the court is disposition of defendant's motion for summary judgment.

bid invitation is not an offer itself from which plaintiff can create a binding agreement by accepting. *Eagle Aviation, Inc. v. United States*, 9 Cl.Ct. 128, 131 (1985). Rather, the bids received constitute offers. *Sterling–Kates v. United States*, 12 Cl. Ct. 290, 304 (1987).

■ Apparently recognizing this obstacle, plaintiff argues that an express written contract arose at two other points in the parties' dealings. First, plaintiff maintains that an express written contract arose when the Postal Service "accepted" plaintiff's offer to lease on May 23, 1986 when acting contracting officer Earl Martin sent a letter to Essen in response to Essen's request for such a letter to satisfy its permanent lender. However, Martin's letter states that it was sent "to confirm the U.S. Postal Service's interest in the bid proposal of [Essen] *subject to final drawings and cost estimates*. (Emphasis added). Second, plaintiff alleges that the express written contract was "reconfirmed" in August 1986 when Griffin sent the unexecuted lease agreement to plaintiff for execution. Plaintiff, however, ignores the fact that the materials sent by Griffin spelled out the conditions precedent to any lease agreement that must be met.

In *Russell Corp. v. United States*, 210 Ct.Cl. 596, 537 F.2d 474 (1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977), the Court of Claims set out the elements of an express contract: "For there to be an express contract, the parties must have intended to be bound and must have expressed their intention in a manner capable of understanding. A definite offer and *an unconditional acceptance must be established.*" *Russell, supra*, 210 Ct.Cl. at 608, 537 F.2d at 481–82 (emphasis added). In *Pacific Gas & Electric Co. v. United States*, 3 Cl.Ct. 329 (1983), *aff'd*, 738 F.2d 452 (Fed.Cir.1984), the Claims Court observed that the requirements for establishing an express or implied-in-fact contract are the same. Plaintiff must show: "mutuality of intent to contract, offer and acceptance, and that the officer whose conduct is relied upon had actual authority to bind the government in

contract." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985); *see also Pacific Gas, supra*, 3 Cl.Ct. at 339.

In a case involving the negotiation of a lease agreement, the Claims Court explained:

A contract is formed at the conclusion of negotiations when the parties have reached a meeting of the minds. (Frequently, the government advises the contractor of this event by forwarding a document reducing all agreements to writing. When the contractor executes this document, and returns it to the government, it submits its final proposal or "offer." Execution by the government then constitutes the government's "acceptance" of the proposal.)

*Sterling–Kates, supra*, 12 Cl.Ct. at 304.

As the facts show, the Postal Service's May 23 letter does not unambiguously manifest its acceptance of plaintiff's offer to lease, but rather clearly informs plaintiff that the Postal Service's acceptance is contingent upon cost and other factors. Moreover, in a March 14, 1986 response to plaintiff's March 13 letter, Griffin expressed the Postal Service's "intention to lease the space your partnership has offered," but emphasized that "[s]everal items must be approved and agreed upon between the two parties prior to any signed contract. Mainly, final approval of your offer, cost of improvements ... and mutual agreement of drawings and construction."

A mere statement of intention, however, is not enough to manifest an unambiguous acceptance of an offer, especially when coupled with a condition precedent. The Court of Claims has stated that "the obligation of the government, if it is to be held liable, must be in the form of an undertaking, not as a mere prediction or statement of opinion or intention." *Cutler–Hammer, Inc. v. United States*, 194 Ct.Cl. 788, 794, 441 F.2d 1179, 1182 (1971). " 'A notice of acceptance that is in any respect conditional *or that reserves to the party giving it a power of withdrawal is not an operative notice of acceptance.*' " *Uniq Computer*

*Corp. v. United States,* 20 Cl.Ct. 222, 231 (1990) (emphasis added by *Uniq* court) (quoting 1A A. Corbin, *Corbin on Contracts, A Comprehensive Treatise on the Working Rules of Contract Law* § 264 (1963)). The written correspondence from the Postal Service to plaintiff clearly reflects the fact that no meeting of the minds ever took place, because the Postal Service's acceptance of plaintiff's offer to lease space in Essen Mall was contingent upon the Postal Service's receipt of a bid for tenant improvements that was acceptable in terms of cost.

██ Nevertheless, plaintiff argues that the express written contract was "reconfirmed" in August 1986, when Griffin sent the unexecuted lease agreement and two copies to plaintiff for the partners' execution. The fact that plaintiff executed the agreement but the Postal Service never did is not sufficient, argues plaintiff, to avoid the contract. Plaintiff relies on *United States v. Purcell Envelope Co.,* 249 U.S. 313, 39 S.Ct. 300, 63 L.Ed. 620 (1919), for the proposition that a contracting officer need not sign a contract in order for it to be binding on the government. *Purcell Envelope* can be distinguished, however, from the present case, since here the Postal Service clearly informed plaintiff several times in writing that its acceptance of plaintiff's offer to lease was contingent upon getting an acceptable bid for tenant improvements. In *Purcell Envelope,* the execution of an instrument was not a condition precedent to the creation of the contract. Under the procurement at issue in the *Purcell Envelope* case, the manner of manifesting acceptance of an offer was by sending the bidder an award order. Under such circumstances, the execution of a contract was an insignificant technicality. However in this case, under Postal Service rules and regulations, the execution of a contract by the Postal Service was a critical and significant event. It was the *"sine qua non"* of a contract agreement. Plaintiff by its conduct throughout the negotiations was aware of this critical fact. The lease must be executed by an appropriate Postal Service official to be binding on the parties. As a result, plaintiff's reliance on *Purcell Envelope* is misplaced.

### B. Condition Precedent

██ Section 225 of the Restatement (Second) of Contracts sets forth the rule with regard to a promise subject to a condition precedent:

(1) Performance of a duty subject to a condition cannot become due unless the condition occurs or its non-occurrence is excused.

(2) Unless it has been excused, the non-occurrence of a condition discharges the duty when the condition can no longer occur.

(3) Non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur.

Comment (b) to section 227 of the Restatement explains that:

The non-occurrence of a condition of an obligor's duty may cause the obligee to lose his right to the agreed exchange after he has relied substantially on the expectation of that exchange, as by preparation or performance. The word "forfeiture" is used in the Restatement to refer to the denial of compensation that results in such a case. The policy favoring freedom of contract requires that, within broad limits, the agreement of the parties should be honored even though forfeiture results.

In the present case, plaintiff argues that the Postal Service's May 23, 1986 letter expressing its interest in plaintiff's bid proposal constitutes an express written contract. The Postal Service's acceptance of plaintiff's offer was, however, conditioned upon the Postal Service's receipt of an acceptable bid for tenant improvements. Since the Capital Investment Committee had only authorized $125,000 for the improvements, and the lowest bid for tenant improvements received was $199,870, the condition upon which the Postal Service had based its duty to enter into the lease agreement did not occur. Thus, no agreement to lease materialized between the two parties.

In *Wells v. United States*, 199 Ct.Cl. 324, 463 F.2d 434 (1972), plaintiff purchased land in anticipation that it would be leased by the Postal Service, but such a lease was subject to approval by departmental headquarters. The court said that where " 'the contract to be executed between parties is subject to approval by another and that approval is not subsequently given, no binding contract exists on which the United States may be required to respond in damages as for a breach.' " *Wells, supra,* 199 Ct.Cl. at 337, 463 F.2d at 441 (quoting *Ship Constr. Co. v. United States,* 91 Ct.Cl. 419, 462 (1940), *cert. denied,* 312 U.S. 699, 61 S.Ct. 737, 85 L.Ed. 1133 (1941)).

### C. *Unexecuted Lease*

The materials before the court indicate that both the Postal Service and Essen contemplated that their agreement would be reduced to writing in the form of a written lease agreement. Gremillion wrote several letters to Postal Service officials urging them to sign the lease, thus indicating that he realized the parties' agreement was incomplete until the Postal Service executed the lease. Indeed, Postal Service rules and regulations required that a lease such as is in issue herein must be in writing and executed by appropriate Postal Service officials to be effective and binding.

In *Kilmer Village Corp. v. United States,* 139 Ct.Cl. 231, 153 F.Supp. 393 (1957), a contractor entered into negotiations with the Army for construction of family housing units on an Army reservation, but the project was discontinued when the reservation was deactivated. The court rejected the contractor's argument that the negotiations had progressed to a stage where a contract, either express or implied-in-fact, arose. The court held that since the Secretary of the Army was the only one who could execute the lease, and he failed to do so, the negotiations never ripened into a lease. *Kilmer Village, supra,* 139 Ct.Cl. at 235–36, 153 F.Supp. at 397. The court found that:

> [n]othing could or would be done until the lease was agreed upon and signed by the parties. This was known to plaintiff and was certainly the intention of the defendant. The intention of the defendant is further evidenced by its willingness to further negotiate a lease even after deactivation of the camp.... [W]e think it clear that no contract can be implied from the circumstances surrounding the transaction. It is probably the rule rather than the exception that money is spent and not recovered in circumstances where a contract is not consummated. The fact that plaintiff lost money is not enough.

*Kilmer Village, supra,* 139 Ct.Cl. at 236, 153 F.Supp. at 397.

The parties do not dispute the fact that the Postal Service never executed the written lease agreement. In *American General Leasing, Inc. v. United States,* 218 Ct.Cl. 367, 587 F.2d 54 (1978), the government indicated that its intention to sign a lease agreement was conditioned on two factors: a written letter and formal financing from GSA. The court held that although "[t]he parties may have completed the negotiations that would have led to a contract, but they had not taken the final and essential step of actually executing an agreement ... there is no binding express oral contract between the parties enforceable against the Government." *American General Leasing, supra,* 218 Ct.Cl. at 373–74, 587 F.2d at 58. *See also City of Klawock v. United States,* 2 Cl.Ct. 580, 584 (1983), *aff'd,* 732 F.2d 168 (Fed.Cir.1984).

Furthermore, the fact that the Postal Service and plaintiff continued discussions on the Essen Mall project for nearly four months after the Postal Service officially notified plaintiff that it did not want to continue with the project indicates the absence of bad faith on the part of the Postal Service, and suggests that negotiations were not complete in November 1986, when the Postal Service formally declined to lease space in Essen Mall. *See Kilmer Village, supra,* 139 Ct.Cl. at 236, 153 F.Supp. at 397.

In *Prevado Village Partnership v. United States,* 3 Cl.Ct. 219 (1983), the Claims Court found no bad faith on the government's part in refusing to further negotiate

certain requirements remaining to consummate an agreement, and the court found, as a result, no implied-in-fact contract had been formed, as no meeting of the minds had occurred. The court advised that "[i]t is well to bear in mind that a presumption exists that public officials perform their duties in a proper manner ... [and] [i]t takes 'well-nigh irrefragable proof' to rebut this presumption." *Prevado Village, supra*, 3 Cl.Ct. at 226 (quoting *Knotts v. United States*, 128 Ct.Cl. 489, 492, 121 F.Supp. 630 (1954)).

## II. Contract Implied-in-Fact

A contract implied-in-fact is one "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Atlas Corp. v. United States*, 895 F.2d 745, 754 (Fed.Cir.1990), *petition for cert. filed*, (U.S. May 3, 1990) (No. 89–1705) (quoting *Porter v. United States*, 204 Ct.Cl. 355, 365, 496 F.2d 583, 590 (1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975)). In *Russell, supra,* the court explained that:

> a contract implied in fact requires a showing of the same mutual intent to contract as that required for an express contract. The fact that an instrument was not executed is not essential to consummation of the agreement. It is essential, however, that the acceptance of the offer be manifested by conduct that indicates assent to the proposed bargain.

*Russell, supra*, 210 Ct.Cl. at 609, 537 F.2d at 481–82. In fact, the Claims Court has found that "the presence of a manifestation of assent is the overriding factor" in proving an implied-in-fact contract. *City of Alexandria v. United States*, 3 Cl.Ct.

667, 675 (1983), *rev'd on other grounds,* 737 F.2d 1022 (Fed.Cir.1984).

### A. *Mutuality of Intent*

■ Plaintiff argues that an implied-in-fact contract was formed between plaintiff and the Postal Service based on a meeting of the minds that can be inferred from a chronology of the events that took place between the bid solicitation for leased space and the opening of bids for tenant improvements. However, as stated above, an implied-in-fact contract requires the same showing of mutuality of intent, unambiguous offer and acceptance, and actual authority to bind the government as an express contract. *See Russell, supra*, 210 Ct.Cl. at 609, 537 F.2d at 481–82. As discussed above, the Postal Service clearly indicated more than once that its intent to be bound was conditioned upon receiving an acceptable improvements bid. Since the opening of those bids is the last event upon which plaintiff relies to show that a meeting of the minds took place, there was clearly no manifestation of an unambiguous acceptance by the Postal Service of plaintiff's offer to lease before that event. The opening of the bids on tenant improvements constituted the failure of the condition upon which the Postal Service's acceptance was contingent, since none of the bids was within the amount authorized for such improvements.[6]

As discussed above, it is clear from the correspondence between the parties that the goal of their negotiations was the mutual execution of a written lease agreement. In *Pacific Gas, supra*, the Claims Court explained that "[e]xtensive negotiations in which the parties demonstrate hope and intent to reach an agreement are not sufficient in and of themselves to establish a contract implied-in-fact. Moreover, in ne-

---

**6.** The bid invitation for tenant improvements reflects an estimated cost range of $125,000 to $175,000, which indicates that the Postal Service's original estimate of $125,000, for which it received authorization from the Capital Investment Committee, may have been based on a misunderstanding of the extensive nature of improvements required at the Essen Mall site, which was no more than a shell structure. There is no indication in the materials before

the court that the Postal Service deliberately underestimated the cost of tenant improvements, as plaintiff suggests. The materials before the court indicate that the Postal Service may have been willing to get authorization from the Capital Investment Committee to spend as much as $175,000 on tenant improvements. However, when the lowest bid came in at $199,870, the Postal Service was unwilling to spend that much on a temporary facility.

gotiations where the parties contemplate that their contractual relationship would arise by means of a written agreement, no contract can be implied." *Pacific Gas, supra*, 3 Cl.Ct. at 339. *See also Kilmer Village, supra*, 139 Ct.Cl. at 236, 153 F.Supp. at 396–97 (no contract implied-in-fact where negotiations are preliminary and primarily for entering into lease with government); *City of Klawock, supra*, 2 Cl.Ct. at 585; *Tree Farm Dev. Corp. v. United States*, 218 Ct.Cl. 308, 317–18, 585 F.2d 493, 498–99 (1978).[7]

Similarly, in *Byrne Organization, Inc. v. United States*, 152 Ct.Cl. 578, 287 F.2d 582 (1961), the Court of Claims held that plaintiffs were not entitled to recover on the terms of a written agreement that was never executed by the government. The court observed that the fact that the parties intended to make a subsequent contract is evidence that their prior negotiations were not intended to be binding. *Byrne Organization, supra*, 152 Ct.Cl. at 585, 287 F.2d at 586. The court also found it important that plaintiffs were not "inexperienced persons against whom knowledge of the legal limitations of government officials should not be implied," but rather they were "experienced contractors who ... sought by way of a lawsuit to reduce the expenses they had incurred in attempting to induce" a lucrative contract. *Byrne Organization, supra*, 152 Ct.Cl. at 587, 287 F.2d at 587. While there is no indication in the materials before the court that Gremillion had prior contracting experience with the government, plaintiff revealed at oral argument that Gremillion worked for the federal government in the banking regulation area before engaging in private enterprise activities. Accordingly, he was no stranger to government requirements and constraints.

### B. *Implied Actual Authority*

■ As discussed above, in order to prove the existence of an implied-in-fact contract, plaintiff must show, in addition to mutual intent and lack of ambiguity in offer and acceptance, actual authority to bind the government. Plaintiff argues that it has met the authority element of an implied-in-fact contract because Griffin allegedly had implied actual authority to bind the government. As mentioned previously, the third element of an implied-in-fact contract is the necessity that the officer whose conduct is relied upon have authority to bind the government. *See H.F. Allen Orchards, supra*, 749 F.2d at 1575; *Pacific Gas, supra*, 3 Cl.Ct. at 339. Plaintiff relies on *H. Landau & Co. v. United States*, 886 F.2d 322 (Fed.Cir.1989), in which the Federal Circuit held that "[a]lthough apparent authority will not suffice to hold the government bound by the acts of its agents ... implied actual authority, like express actual authority, will suffice." *H. Landau, supra*, 886 F.2d at 324 (citation omitted). The court explained that " '[a]uthority to bind the [g]overnment is generally implied when such authority is considered to be an integral part of the duties assigned to a [g]overnment employee.' " *H. Landau, supra*, 886 F.2d at 324 (quoting J. Cibinic & R. Nash, *Formation of Government Contracts* 43 (1982)).

Plaintiff contends that, although Larry Herndon and Earl Martin had actual authority to bind the government as contracting officers, Griffin had implied actual authority based on several factors. Plaintiff argues that the authority and responsibility vested in Griffin, as project manager, by the Postal Service, gave Griffin implied actual authority. Moreover, plaintiff claims Griffin had implied actual authority because the definition of "contracting officer" in the bid invitation for leased space

7. For examples of implied-in-fact contracts relative to leases *see Buffalo & Fort Erie Public Bridge Authority v. United States*, 106 Ct.Cl. 731, 65 F.Supp. 476 (1946) (government occupies premises after owner has demanded rent); *Raymond Commerce Corp. v. United States*, 93 Ct.Cl. 698 (1941); *Security Life and Accident Ins. Co. v. United States*, 357 F.2d 145 (5th Cir.1966) (government continues to occupy lessor's prem-

ises after lease expires, paying rent which is accepted by lessor). The court cannot find the existence of an implied-in-fact contract on the facts of this case. In this case, the Postal Service did not execute any lease, it did not occupy the premises, and it did not receive any benefit from plaintiff. The best that can be said is that the parties negotiated, without success, to reach an agreement.

includes a contracting officer's "authorized representative." While Griffin could serve as an "authorized representative" of the contracting officer in some matters, he could not under Postal Service rules and regulations enter into contracts on behalf of the Postal Service. Likewise, an erroneous and mistaken reference to Griffin as a contracting officer cannot change the fact that he was not a contracting officer. Finally, plaintiff alleges that, because the Postal Service failed to inform plaintiff that Griffin was not a contracting officer, the court should find that Griffin had implied actual authority.

The general rule regarding the authority of government agents to bind the government is set forth in *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947):

> [A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegation legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority.

*Federal Crop Insurance, supra,* 332 U.S. at 384, 68 S.Ct. at 3. *See also Heckler v. Community Health Servs., Inc.,* 467 U.S. 51, 63 n. 17, 104 S.Ct. 2218, 2225 n. 17, 81 L.Ed.2d 42 (1984); *H.F. Allen Orchards, supra,* 749 F.2d at 1575; *Miles Farm Supply, Inc. v. United States,* 14 Cl.Ct. 753, 756–57 (1988). The Federal Circuit has explained that "[w]here an approving official exceeds his authority, the government can disavow the official's words and is not bound by an implied contract." *New America Shipbuilders, Inc. v. United States,* 871 F.2d 1077, 1080 (Fed.Cir.1989).

In *Kilmer Village, supra,* the court found no contract came into being when the Secretary of the Army declined to execute a lease after extensive negotiations, since only the Secretary had authority to contract, and his representatives could only negotiate a lease subject to the Secretary's approval. *Kilmer Village, supra,* 139 Ct.Cl. at 235, 153 F.Supp. at 396.

The materials before the court clearly indicate that Griffin had no contracting officer authority, as Griffin himself admits in his deposition. Although Griffin stated that, in conducting lease negotiations, he was the contracting officer's "authorized representative," that statement was clarified by Jerry Adkins, general manager of the real estate division in the Memphis regional office. In his deposition, Adkins stated that a contracting officer such as Charles Smith could not delegate his contracting authority, but he could appoint an "authorized representative" for purposes of negotiations, although such a representative would possess no contracting authority. As Larry Herndon explained by deposition, he became contracting officer pursuant to a written delegation of authority from Jerry Adkins, as provided in Postal Service regulations governing procurement. The materials before the court indicate that Postal Service regulations prohibit contracting officers such as Herndon from delegating their contracting authority. While Griffin's actions and words may have led plaintiff to believe that Griffin had authority bind the Postal Service by way of a contract, the clear evidence set forth in Postal Service regulations and in the depositions of relevant Postal Service officials, shows that Griffin had no contracting officer authority. *See Miles Farm Supply, supra,* 14 Cl.Ct. at 756–57 (although government agent may have explicitly or implicitly misrepresented his authority to plaintiff, plaintiff assumes risk of accurately ascertaining scope of government agent's authority). Indeed, Griffin in his deposition clearly stated he had no authority to bind the government by way of entering into a lease agreement.

Plaintiff likewise seems to suggest that Tannor Dupard, a Postal Service delivery and retail analyst, also made representations which amounted to an oral contract binding the Postal Service. The deposition of Dupard and the regulations and rules of the Postal Service clearly show that Du-

pard had no authority to contractually bind the Postal Service.

## III. Ratification

Plaintiff argues that Griffin's actions were known, directed and ratified by the contracting officers on this project. In support of this argument, plaintiff relies, *inter alia*, on *Fox Valley Eng'g, Inc. v. United States*, 151 Ct.Cl. 228 (1960). That case is distinguishable, however, because in that case the government never denied that its officials had authority to act on behalf of the contracting officer, unlike the case at bar. Moreover, this argument is merely a reiteration of plaintiff's argument that Griffin had implied actual authority to bind the government, which has been discussed and rejected above.

## IV. Equitable Estoppel

■ Plaintiff argues that the facts in this case support a finding that the government should be equitably estopped from denying the existence of a contract. The elements which plaintiff must meet in order to support the application of the doctrine of equitable estoppel are as follows:

(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe that it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Pacific Gas, supra,* 3 Cl.Ct. at 340. A fifth element of equitable estoppel was identified in *City of Alexandria, supra:* "In order to estop the Government, the conduct or representations relied upon must be made by government officers acting within the scope of their authority." *City of Alexandria, supra,* 3 Cl.Ct. at 679 (citing *Jackson v. United States*, 216 Ct.Cl. 25, 41, 573 F.2d 1189, 1197 (1978)); *see also Miles Farm Supply, supra,* 14 Cl.Ct. at 757.

Plaintiff argues that it has met elements one and three of the equitable estoppel doctrine because the Postal Service knew that the approved sum of $125,000 for tenant improvements was unrealistic, because the Postal Service knew that the new officials did not want the temporary postal facility located in a space the size of Essen's site, and because the $125,000 figure presented to potential bidders on the tenant improvements exceeded the approved cost by at least $15,000. The materials before the court show that only $115,000 was actually approved for construction of tenant improvements, and the remaining $10,000 was earmarked for support and design.

Plaintiff maintains that it has met the second element of the equitable estoppel doctrine, intent, by pointing to the Postal Service's conduct in sending the May 23, 1986 letter to Essen expressing the essential terms of the lease, and in sending the lease agreement to Essen for execution.

Finally, plaintiff claims that it has met the fourth element of the equitable estoppel doctrine, reliance, by pointing to Essen's expenditure of $513,002.57 to secure the permanent loan to finance the shopping center, and by foregoing the pursuit of other tenants in reliance on the Postal Service's assurances that it would be a tenant.

Plaintiff makes no attempt to meet the fifth element of equitable estoppel, that is, actual authority to make the alleged representations, other than its implied actual authority argument discussed *supra*. This argument was rejected by the court for the reasons cited *supra*.

As discussed above, plaintiff had no right to rely on the Postal Service's conditional acceptance of plaintiff's offer to lease space in Essen Mall before the condition had occurred, *i.e.*, the Postal Service's award of a construction contract for tenant improvements. *See Wells, supra,* 199 Ct.Cl. at 337, 463 F.2d at 441. In addition, plaintiff had no right to rely on the assurances of Postal Service employees who did not have contracting authority, such as Griffin. *See Federal Crop Insurance, supra,* 332 U.S. at 384, 68 S.Ct. at 3; *City of Alexandria, supra,* 3 Cl.Ct. at 679. Moreover, the materials at hand support a finding that cost factors played a major role in the Postal Service's decision not to accept plaintiff's offer to lease space. Parenthetically, while the $125,000 construction cost

figure was ultimately determined to be too low, it was the only construction cost figure the Postal Service authorized. Subsequent estimates raised that construction cost figure. The Postal Service's actions in this regard were taken in good faith and provide no basis supportive of an equitable estoppel argument against the government. Clearly, plaintiff has not met the elements necessary to sustain an application of the doctrine of equitable estoppel. In any event, the Supreme Court has recently held, in the context of government employee misconduct, that the doctrine of equitable estoppel will not lie against the government. *See Office of Personnel Management v. Richmond,* —— U.S. ——, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). The Supreme Court observed that it has never upheld an estoppel claim against the government for the payment of money. *OPM v. Richmond, supra,* 110 S.Ct. at 2470. Since this court's jurisdiction is limited by the Tucker Act, 28 U.S.C. § 1491, to payment of money damages against the government, *see United States v. Testan,* 424 U.S. 392, 401–02, 96 S.Ct. 948, 954–55, 47 L.Ed.2d 114 (1976), plaintiff's equitable estoppel argument cannot be sustained.

### VI. Negligent Misrepresentation

■ In its unpublished order of February 22, 1990 (see note 5, *supra* ), the court found that plaintiff's negligent misrepresentation and tort claims had a sufficient nexus to its contract claims to survive defendant's motion to dismiss for lack of subject matter jurisdiction. Since the court has found that no contract exists between the parties, either express or implied-in-fact, there can be no recovery of damages for breach of contract. In *H.F. Allen Orchards, supra,* the Federal Circuit observed that where no contractual duty exists, the "negligent performance of a non-contractual duty cannot be the basis of a breach of contract claim." *H.F. Allen Orchards, supra,* 749 F.2d at 1576.

### VII. Damages

■ Finally, plaintiff opposes defendant's argument that plaintiff's alleged damages for loss of value to the shopping center are too remote and speculative to be recoverable in any event. In its complaint, plaintiff requests $513,002.57 for permanent loan closing costs, and $2,300,000 for loss of value to the shopping center. Defendant, and properly so, does not oppose plaintiff's claim for $513,002.57 for permanent loan closing costs in attacking plaintiff's damage claims. The damage claim for loss of value to the shopping center is further broken down into loss of business reputation ($300,000), loss of future rent revenues ($750,000), loss of revenues due to lower rent levels ($750,000), and general impairment to the mall's marketability and earnings from potential sale of mall ($500,-000). These damage claims, with the exception of the loss of business reputation claim, seek recovery of anticipated but unearned profits from outside business, outside contracts and general company worth. The case law is clear in holding that damages claims for loss of anticipated profits are generally "too remote, consequential and speculative" from any breach that may have occurred to be recoverable as a matter of law. *Rhen v. United States,* 17 Cl.Ct. 140, 143–44 (1989). *See Olin Jones Sand Co. v. United States,* 225 Ct.Cl. 741, 743–44 (1980); *see also William Green Constr. Co. v. United States,* 201 Ct.Cl. 616, 626, 477 F.2d 930, 936–37 (1973), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213 (1974) (no recovery for general loss of business damages or damages for loss of entire company's net worth as they are too remote and speculative). In addition, loss of business reputation is not a compensable damage claim in this court because it sounds in tort and is too remote and speculative. *See Algonac Mfg. Co., supra,* 192 Ct.Cl. at 663, 428 F.2d at 1249; *South Louisiana Grain Servs. v. United States,* 1 Cl.Ct. 281, 286 n. 5 (1982); *H.H.O., Inc. v. United States,* 7 Cl.Ct. 703, 706–07 (1985).

### VIII. Summary Judgment

■ Summary judgment is a useful procedural tool that "isolates and disposes of factually unsupported claims or defenses, *Celotex Corp. v. Catrett,* 477 U.S. 317,

323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), serves judicial economy, and saves time and expense when trial is unnecessary." *Cloutier, supra,* 19 Cl.Ct. at 328. In *Celotex, supra,* the Supreme Court explained that: "[S]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules [of Civil Procedure] as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.Rule Civ.Proc. 1." *Celotex, supra,* 477 U.S. at 327, 106 S.Ct. at 2555.

Plaintiff argues emphatically that it has amply demonstrated the existence of material factual disputes, and therefore defendant is not entitled to summary judgment as a matter of law. Specifically, plaintiff identifies as a material factual dispute whether Griffin had contracting officer authority. Plaintiff also argues that the $125,000 figure authorized for tenant improvements was "unrealistic and impossible to meet." Plaintiff identifies additional disputes, but they involve contract formation and breach of contract issues, which are legal rather than factual issues.

Plaintiff has been given the opportunity to conduct extensive discovery in this case, and it did so. Depositions were taken of most, if not all of the Postal Service officials involved in this case. Plaintiff's conduct at these depositions was professional and aggressive. Plaintiff utilized excerpts from the depositions of relevant Postal Service personnel in its opposition to defendant's motions to dismiss and defendant's alternative motion for summary judgment. Plaintiff wants a trial, it says, to probe by "aggressive cross-examination" the credibility of these Postal Service employees. It does not say what material facts it will uncover by trial that would change the result reached herein. Plaintiff intends, at trial, to rely on "aggressive cross-examination." Upon careful review of all the materials before the court, the court concludes that there is no dispute about those material facts that control the determination of whether there was a binding agreement between the Postal Service and plaintiff. A material factual dispute is one that will

make a difference in the outcome of a case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Singleton v. United States,* 6 Cl.Ct. 156, 167 (1983). Moreover, the totality of the oral argument supports the view that summary judgment is appropriate in this case.

In the case at bar, there is no dispute regarding the facts underlying the contract negotiations. There is no dispute about the fact that the Postal Service intended to contract with plaintiff (see letter of March 14, 1986 from the Postal Service to plaintiff). There is no dispute about the fact that the parties conducted negotiations relative to a lease agreement. There is no dispute about the fact that plaintiff was advised on a number of occasions that certain preconditions must occur before any lease agreement could be entered into by the Postal Service (see, *e.g.,* Supplement to Lease Agreement ¶ 12). There is no dispute about the fact that these preconditions never occurred. There is no dispute about the fact that a lease signed by both parties was necessary before an agreement could be deemed binding (see, *e.g.,* plaintiff's letters of July 3, 1986 and July 25, 1986). There is no dispute about the fact that the Postal Service never executed the lease agreement. The court recognizes that the equities lie with plaintiff in this case, but whatever equities the court may harbor in its heart toward plaintiff are dissipated by the stern language in *OPM v. Richmond, supra,* 110 S.Ct. at 2469, regarding "hard cases" such as this one.

As discussed above, the court finds that there is no viable dispute that Griffin had no contracting officer authority, either express or implied. The depositions of relevant Postal Service officials, including Griffin himself, clearly show that Griffin had no contracting officer authority. Moreover, the relevant Postal Service regulations governing procurement clearly show that real estate specialists such as Griffin have no contracting officer authority.

Finally, the court finds that there is no meaningful dispute relative to the $125,000 estimate of improvement costs. The Postal

Service believed at the time the estimate was made that $125,000 was a realistic amount to spend on tenant improvements for a temporary facility. It was subsequently determined by other estimates that this estimate was too low. Whatever significance is placed on the $125,000 estimate or the other estimates arrived at by the Postal Service, the undisputed significant fact is that the bids responding to the solicitation to do the improvement work were above all these estimates. This factor was too much of a burden for the Postal Service to carry for a facility that was a temporary and small project with a limited life at a time when a larger facility would be of greater help to the Postal Service in meeting its overcrowding problems in the concerned area. There is no evidence of bad faith on the part of Postal Service employees in formulating its $125,000 estimate or in its dealing with plaintiff in any way during the negotiation process. As indicated previously, the fact that plaintiff lost money because its bid was not accepted is a risk inherent in the bidding process. *See Kilmer Village, supra; Byrne Organization, supra.*

In opposing the summary judgment motion, plaintiff does not allege that he can prove the existence of new facts. Accordingly, it is reasonable to conclude plaintiff intends to rely on the facts at hand, not new facts. Oral argument seemed to confirm this conclusion. Plaintiff merely asserts that he can, by "aggressive cross-examination," relative to the facts at hand, undermine the credibility of those Postal Service employees who were deposed during discovery. In opposing defendant's motion for summary judgment, plaintiff "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in [Rule 56(c) ] must set forth specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 11, 106 S.Ct. 1348, 1355 n. 11, 89 L.Ed.2d 538 (1986). Even accepting plaintiff's alleged facts as true, as the court must for purposes of the summary judgment motion, the court finds no material factual disputes. "Only dis-

putes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, supra,* 477 U.S. at 248, 106 S.Ct. at 2510.

Plaintiff attempts to characterize as a factual issue the legal issue of whether a contract exists between the parties. Specifically, the issue of whether Griffin had implied actual authority to contract for the government is a legal inquiry for the court to decide, and the court has found that Griffin had no such authority. No amount of cross-examination can change this result. Plaintiff's detrimental reliance arguments supporting its opposition to the motion for summary judgment are based in equity, not in law. As a court of law, this court's predecessor emphasized that while "[i]t is probably the rule rather than the exception that money is spent and not recovered in circumstances where a contract is not consummated[,] . . . [t]he fact that plaintiff lost money is not enough." *Kilmer Village, supra,* 139 Ct.Cl. at 236, 153 F.Supp. at 397.

Summary judgment should not be denied on "the mere assertions of counsel" (*e.g.,* "aggressive cross-examination") or on "conclusionary pleading that genuine issues of material fact exist . . . nor should such a motion be denied merely to satisfy a litigant's speculative hope of finding some evidence that might serve to save [plaintiff's] complaint from dismissal." *Singleton, supra,* 6 Cl.Ct. at 168. *See also Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984). Moreover, the Claims Court has held that summary judgment is proper under the following circumstances: "Summary judgment pursuant to RUSCC 56 properly can intercede and prevent trial if the movant can demonstrate that trial would be useless in that more evidence than is already available in connection with its motion could not reasonably be expected to change the result." *Troise v. United States,* 21 Cl.Ct. 48, 60 (1990) (to be reported at 21 Cl.Ct. 48) (citing *Pure Gold, supra,* 739 F.2d at 626). The court finds the circumstances in the case at

bar warrant the entry of summary judgment in defendant's favor. Accordingly, the court finds plaintiff's argument that defendant is not entitled to summary judgment due to the existence of material factual disputes to be without merit.

## CONCLUSION

For reasons discussed above, defendant's motion for summary judgment is granted. The clerk of court is directed to enter judgment dismissing plaintiff's complaint. No costs.